**In the Matter of INTERCO INCORPORATED, et al., Debtors.**

**Bankruptcy No. 91–40442–172.**

United States Bankruptcy Court,
E.D. Missouri, E.D.

June 6, 1991.

See also 130 B.R. 301.

Bryan, Cave, McPheeters & McRoberts, Gregory D. Willard, Lloyd A. Palans, John C. Boyle, Carl J. Spector, for debtors-in-possession.

William A. Krohley, Kelley, Drye & Warren, New York City, for Sandra Mayerson, Examiner.

ORDER AUTHORIZING DEBTORS TO IMPLEMENT PERFORMANCE/RETENTION PROGRAM FOR CRITICAL EXECUTIVES

JAMES J. BARTA, Bankruptcy Judge.

Upon the *Motion to Implement Performance/Retention Program for Critical Executives* (the "Motion") dated April 24, 1991, filed by the above-captioned Debtors and Debtors–in–Possession (collectively, the "Debtors" and hereinafter referred to interchangeably as "Debtors" and "Interco"), as modified pursuant to announcements in open Court, the Court having reviewed the Motion (as modified), considered the evidence and having heard the statements of counsel for the Debtors in support thereof and the relief requested therein and duly considered the same;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED that:

1. This Court has jurisdiction over this matter and the parties and property affected thereby pursuant to 28 U.S.C. §§ 157 and 1334 and Local District Court Rule 29. This is a core proceeding pursuant to 28 U.S.C. § 157.

2. In order to maintain and enhance the Debtors' estates during Chapter 11, continue a competitive operating status within highly competitive industries and confirm a successful reorganization plan, it is essential that the Debtors retain certain critical executives (the "Critical Executives"). INTERCO has presently identified 130 Critical Executives, comprised of 27 persons at Broyhill, 34 persons at Lane, 30 persons at Florsheim, 21 persons at Converse and 18 persons at INTERCO's St. Louis corporate headquarters. The Critical Executives include select senior management and are the CEO's, CFO's, division presidents, senior vice presidents, critical division vice presidents, critical corporate officers and other select critical management and staff of the Debtors. Without Critical Executives, Debtors' operations would be significantly impaired and prospects of a successful reorganization would be diminished.

3. The Chapter 11 proceedings, by their nature and attendant uncertainty, have prompted heightened employment security concerns among the Critical Executives. These include concerns over (i) material additional work loads, (ii) fears of materially adverse work environments and (iii) perceived limitations upon career opportunities. Moreover, the Critical Executives have heightened concerns regarding their compensation levels.

4. In the past, the Debtors have provided all three major elements of executive compensation, including: (i) base salary; (ii) short-term incentive programs (in the form of annual bonuses); and (iii) long-term incentive programs (in the form of stock options). However, there have recently been only limited salary increases and minimal payments under annual incentive plans due to performance/cash restraints. Moreover, equity holdings hold effectively no value.

5. A material concern expressed by the Debtors is the fact that current stock options are and are expected to remain worthless. Such stock-based, long-term incentive plans are widely used in the Debtors' industries as part of executive compensation packages. Like many counterparts within the furniture and shoe industries, the Debtors have stock plans in place at the corporate and division levels; however, no value currently exists in these plans. Without such long-term incentives, Critical Executives forgo a significant portion of their total compensation. Accordingly, the total compensation package afforded Critical Executives is below industry norms.

6. To address these significant compensation concerns, the Debtors have devised a performance/retention program including a retention plan (the "Retention Plan") for the Critical Executives. A copy of the Retention Plan is attached hereto and incorporated herein by reference as Exhibit A; however due to the confidential nature of information contained in the Retention Plan, the Retention Plan shall be kept under seal in accordance with this Court's April 26, 1991 protective order. A copy of this Order with Exhibit A omitted shall be filed in the public record of these proceedings. The Retention Plan is based upon attaining operating performance targets during Chapter 11. All other elements of the current compensation program for the Critical Executives remain unchanged (except as specifically provided in the Retention Plan), including the current base salary practices and short-term incentive programs at the various divisions. Moreover, certain existing employment agreements and severance agreements will be assumed, subject to a reservation of certain rights.

7. The Retention Plan has, *inter alia,* the features described below. Reference should be made to the copy of the Retention Plan, attached hereto as Exhibit A, for a full recitation of the features, provisions and conditions of the Retention Plan; which copy of the Retention Plan shall control in the event there are any discrepancies between the description below and the attached copy of the Retention Plan.

(a) Cash awards are provided for achievement of specified operating performance goals.

(b) The Retention Plan will be effective as of March 1, 1991 and will remain in place throughout the Chapter 11 proceeding.

(c) Consolidated EBITDA will be used as a Threshold performance measure. At this level of performance, only one-half of the Target Awards will be paid.

(d) If consolidated EBITDA is below the specified level, *no* awards will be paid.

(e) If the Threshold is achieved, any additional payments will be tied to the achievement of (i) various levels of consolidated EBITDA for corporate and EBIT for the operating companies and (ii) satisfaction of a test relating inventory and accounts receivable to net sales.

(f) Each fiscal quarter is a distinct performance period; however, goals for each fiscal quarter will reflect cumulative results to be achieved for the relevant fiscal year. Awards not earned in a given fiscal quarter can be earned later in the relevant fiscal year, but *only if* cumulative results merit such payments.

(g) Actual payments are staggered so that payments are weighted towards the end and after the close of the year. This will strengthen retention and prevent overpayment in early quarters as a result of seasonality of business or exceptional performance in certain quarters relative to the accomplishment of full fiscal year results. Moreover, any payments earned above the Target Level in

any quarter will be deferred until after the close of the fiscal year, when annual results are known.

(h) Actual performance will be compared to the operating performance goals *after* calculating the impact of the Retention Plan. In other words, cash payments pursuant to the Retention Plan will be deducted from actual performance results for purposes of comparing actual performance to the operating performance goals.

(i) Participation in the Retention Plan will include only certain employees critical to the Debtors' ongoing operations, profitability or Chapter 11 reorganization.

(j) Critical Executives at the corporate level will not receive bonuses except in accordance with the Retention Plan but may receive normal base salary increases.

8. Implementation of the Retention Plan is expected to encourage the Critical Executives to remain with the Debtors because the performance measures are realistic and the awards are meaningful. Incentives to be paid are based upon the Debtors' performance. The costs of the Retention Plan are predictable, which should alleviate creditor concerns with respect to cost forecasting. Finally, the Retention Plan is expected to create strong team identification within the Critical Executive group.

9. Similar retention plans have been used in other Chapter 11 proceedings.

10. The annual cost of the Retention Plan in respect of fiscal 1992 is projected to be approximately as follows: at "Threshold"—$1,885,716; at "Target"—$3,771,422; and at "Maximum"—$5,657,135. These costs are reasonable in light of the indispensability of the Critical Executives and the reality that without the Retention Plan, uninterrupted employment of Critical Executives with the Debtors during the entire reorganization process may be at risk.

11. The Debtors also seek authorization to pay confirmation awards (the "Confirmation Awards") to two select Critical Executives, Mr. Richard B. Loynd (Chairman of the Board, President and Chief Executive Officer) and Mr. Eugene F. Smith (Executive Vice President and Chief Financial Officer). Confirmation awards to select senior executives are common and tend to be very significant amounts. Generally, such awards are in addition to base salary and annual incentives and are equal to or a multiple of annual cash compensation. Sizable stock option or other stock grants are often used in conjunction with cash awards as part of confirmation awards. Such stock options or stock grants are not a component of the Retention Plan.

12. Except as provided below, the amount of the Confirmation Awards will be $1.5 million to Mr. Loynd and $500,000 to Mr. Smith. The Confirmation Awards would be paid only in the event a Chapter 11 Plan of Reorganization ("Plan") is confirmed in these proceedings during their employment by the Debtors. Upon confirmation of a Plan, Messrs. Loynd and Smith will forego *any* and all claims related to their existing Employment Agreements (as hereinafter defined) and those Employment Agreements will be terminated, and any Confirmation Awards required by this paragraph 12 will be paid to them. Within 10 business days of the entry of this order, Messrs. Loynd and Smith will execute a written statement confirming their participation in the Retention Plan and the Confirmation Awards and agreeing to the provisions of this paragraph 12. Pursuant to their Employment Agreements, Messrs. Loynd and Smith would have potential claims in excess of the Confirmation Awards against the Debtors in the event of a "change-of-control" (as therein defined). Notwithstanding the foregoing, in the event a Plan has not been confirmed as of January 24, 1993, the amount of the Confirmation Awards shall thereafter be reduced at the below specified rates of reduction until a Plan has been confirmed:

| Participant | Rate of Reduction |
|---|---|
| Richard B. Loynd | $45,000 per month |
| Eugene F. Smith | $15,000 per month |

The Confirmation Awards shall be excluded for purposes of calculating any payments

required to be made to Messrs. Loynd or Smith under any non-qualified executive retirement plan. These Confirmation Awards are reasonable under the circumstances.

13. Interco has certain employment agreements filed under seal herewith as composite Exhibit B (the "Employment Agreements") with 11 of its Critical Executives, including Messrs. Loynd and Smith. The Employment Agreements provide that in the event of a change in control, followed by termination of employment by the employer (other than for cause, retirement, disability or death) or termination by the employee for "good reason", each person with an Employment Agreement is entitled to receive a lump sum payment of 3 times salary and bonus, plus fringe benefits.

14. Employment agreements with such change-of-control provisions are very common among peer companies in the furniture and footwear industries, as well as among the 100 largest industrial companies. Specifically, of twenty-one companies within the peer group, 76% had change-of-control agreements in place. Moreover, 53% of the 100 largest industrial companies also used change-of-control agreements.

15. Critical Executives at Converse are not covered by the Employment Agreements. Instead, 12 Converse executives have written severance agreements filed under seal herewith as composite Exhibit C (the "Severance Agreements"). Under the Severance Agreements, an executive is paid if he is terminated other than for cause, dies or becomes disabled. The Severance Agreements cover two, back-to-back single year periods. Accordingly, the maximum payment under the Severance Agreements is two year's compensation if termination occurs in the beginning of the first period. Over time, payments are scaled down to one year ratably with the minimum payment equal to one year's compensation. The Employment Agreements and the Severance Agreements are hereinafter referred to as the "Agreements".

16. The Agreements are "executory contracts" within the meaning of § 365(a) of the Bankruptcy Code and are thus sub-

ject to assumption, with court approval. Though the Bankruptcy Code does not define "executory contract", the most widely accepted definition is found in V. Countryman, *Executory Contracts In Bankruptcy: Part I,* 57 Minn.L.Rev. 439, 460 (1973). Countryman defines "executory contract" as an "agreement under which the obligations of both the [debtor] and the other party are so far unperformed that failure of either to complete performance would constitute a material breach excusing the performance of the other." This definition was adopted by the Eighth Circuit in *Northwest Airlines, Inc. v. Klinger (In re Knutson),* 563 F.2d 916, 917 (8th Cir.1977).

17. The Debtors have determined, in the exercise of their sound business judgment that assumption of the Agreements, with certain reservation of rights, is necessary to retain the Critical Executives and to successfully reorganize.

18. The Debtors have adequate funds to perform future obligations under the Agreements. Good and sufficient legal cause exists for authorizing the requested relief.

19. The matters which are being determined here require a balancing of the interests of several entities in these cases.

■ 20. As is so often the question for the Bankruptcy Court, each case must be determined on its own in the circumstances which are presented to the Court. In most Chapter 11 cases, it is my opinion that confirmation bonuses should not be authorized until at least the framework of a plan of reorganization has been prepared.

■ 21. Similarly, the change of control agreements which have been described here should generally not be authorized for the first time after commencement of a bankruptcy case.

■ 22. The Debtors here operate in a highly competitive business atmosphere. The executives which are to be affected by these agreements are experienced in the conduct of the Debtors' business operations and, in my opinion, are essential to the continued efforts to reorganize.

23. The Debtors' post-petition business judgments so far have been accurate and have sustained what I had previously referred to as the momentum toward reorganization which has been shown to exist in these cases. There is no reason at this time to interrupt this momentum toward reorganization or to delay portions of these incentive retention programs, which the Debtors seek to implement pursuant to the Motion. The Debtors' business judgment in these matters is accepted.

24. I will determine and find and conclude that these agreements are reasonable and fair in the circumstances presented here.

25. The benefits which may result from a delay in approving the change of control agreements and/or Confirmation Award agreements are outweighed by the benefits to be gained by authorizing the full agreements and removing these issues as potential impediments to the process of preparing and confirming a plan of reorganization and allowing the Critical Executives to concentrate their efforts on the attempts to reorganize. Therefore, the balancing in this case tilts toward not delaying a consideration of these agreements and this Order approves and grants the Debtors' Motion to Approve the entire package, consisting of the four elements of the performance/retention program with the changes that have been announced by Mr. Palans, as Debtors' counsel this afternoon, as reflected herein.

26. The Motion (as modified) is approved as of May 30, 1991 and the Debtors are hereby authorized to:

(i) Implement the Retention Plan, attached hereto as Exhibit A, for Critical Executives, effective as of February 24, 1991;

(ii) Pay Confirmation Awards to Mr. Richard B. Loynd (Chairman of the Board, President and Chief Executive Officer) and to Mr. Eugene F. Smith (Executive Vice President and Chief Financial Officer) in the amounts and subject to the conditions hereinbefore specified;

(iii) Assume the Employment Agreements; however, the assumption of the Employment Agreements shall be (a) without prejudice to the right, if any, of any party in interest to challenge the Employment Agreements as if the Debtors had never entered bankruptcy and (b) subject to all non-bankruptcy defenses to the Debtors' performance under the Employment Agreements (including in each case those rights and defenses that devolve upon the Debtors pursuant to Bankruptcy Code Section 544); and

(iv) Assume the Severance Agreements.

EXHIBIT A

Performance/Retention Plan

EXHIBIT B

Employment Agreements

EXHIBIT C

Severance Agreements

(Filed under Seal pursuant to April 26, 1991 Protective Order of the Court.)