## In re AMERICA WEST AIRLINES, INC., Debtor.

### Bankruptcy No. B–91–07505–PHX–RGM.

United States Bankruptcy Court,
D. Arizona.

Aug. 26, 1994.

See also, 166 B.R. 908.

Carl A. Eklund, John Parks, LeBoeuf, Lamb, Greene & MacRae, Denver, CO, for debtor.

Charles R. Sterbach, Gallagher & Kennedy, Phoenix, AZ, local counsel for debtor.

Sander L. Esserman, Stutzman and Bromberg, Dallas, TX, for Indenture Trustee Texas Commerce Bank.

Benjamin Waisbren, Pamela Jimenez, Lord, Bissel & Brook, Chicago, IL, for Equity Security Holders Committee.

Brian Leitch, Arnold & Porter, Washington, DC, for AmWest Partners.

Arnold M. Quittner, Stroock & Stroock & Lavan, Los Angeles, CA, for Transpacific Enterprises.

Henry Kevane, Murphy, Weir & Butler, San Francisco, CA, for Unsecured Creditors Committee.

Adrianne Kalyna, Don C. Fletcher, U.S. Trustee's Office, Phoenix, AZ.

## OPINION AND ORDER GRANTING MOTION FOR AUTHORITY TO PAY SUCCESS BONUSES TO CERTAIN OFFICERS AND EMPLOYEES (CORRECTED)

ROBERT G. MOOREMAN, Chief Judge.

This matter is before the Court pursuant to the Debtor's Motion for Authority to Pay Success Bonuses to Certain Officers and Employees. A hearing was held on August 24,

---

1994, on the motion and the matter was taken under advisement. After due consideration of the motion, the evidence presented, including testimony and exhibits and all arguments and statements of the employees, the record herein, and under the history of and the present posture of the case, the Court finds and concludes the following in making its decision.

1. The Debtor filed for protection under Chapter 11 of the Bankruptcy Code on June 27, 1991.

2. In July, 1991, the Debtor began to cut costs and downsize its workforce by instituting a pay freeze and laying off employees.

3. On August 1, 1991, employee's pay was cut 10% in a further attempt to cut costs.

4. The Court approved the initial Debtor-in-possession financing on September 4, 1991, which allowed the Debtor to remain a viable entity.

5. On September 15, 1991, Ed Beauvais was replaced by Michael Conway, who was named as the Debtor's new Chief Operating Officer. Mr. Beauvais remained as Chairman of the Debtor's Board of Directors.

6. The Debtor announced that its stock would most likely have no value after reorganization on March 17, 1992, sending the price of the Debtor's stock down to 41 cents per share.

7. On July 17, 1992, Mr. Beauvais resigned from his position as Chairman of the Board of Directors. Mr. Conway became the new Chairman of the Board of Directors.

8. In September, 1992, the Debtor continued to cut costs by instituting additional lay-offs.

9. The Court approved additional Debtor-in-possession financing on September 9, 1992.

10. William Franke was elected Chairman of the Board of Directors as a condition required by the lenders of the new financing.

11. The Debtor reported a net profit for the first time in over two years for the first quarter of 1993. The Debtor has reported a net profit for the past six quarters since that time.

12. In June, 1993, the Debtor instituted a transition pay program under which employees were able to share in the Debtor's return to profitability.

13. The pilots voted to be represented by the Air Line Pilots Association in October, 1993.

14. On December 31, 1993, the Board of Directors fired Mr. Conway and Mr. Franke became the Debtor's CEO. On this same date the Debtor hired A. Maurice Myers, a former executive of Aloha Airlines, as the new President and Chief Operating Officer of the Debtor.

15. On February 24, 1994, AmWest Partners became the lead investor based on the investment proposal presented to the Debtor's Board of Directors.

16. The Debtor gave all employees, excluding the pilots, an 8% increase in base salaries. The pilots were involved in collective bargaining at the time of the increase. The collective bargaining is continuing currently.

17. The Board of Directors approved AmWest's amended investment proposal on April 5, 1994.

18. On May 17, 1994, the Debtor filed its first Plan of Reorganization.

19. The Debtor's Plan of Reorganization, a consensual plan, was confirmed on August 10, 1994.

20. The deal between the Debtor and AmWest contemplated under the Plan has been consummated.

21. The proposed success bonuses, approved by the Debtor's Board of Directors on August 9, 1994, are as follows:

a. William A. Franke is to receive 125,000 shares of Class B common stock that is restricted and must be held for at least two years.

b. A. Maurice Myers is to receive $400,-000 cash.

c. Twenty eight other officers and managers are to receive cash bonuses totaling $1,170,706. These bonuses are to be based on a percentage of current base salaries and other factors.

d. The rank and file employees, which number approximately 11,000, are to split $9,500,000. Employees who have been with the Debtor since filing are to receive approximately $1,000 each, while employees hired post-filing are to receive a lower amount.

22. This Court has received approximately seven hundred ex parte letters from employees of the Debtor. All of the letters objected to the success bonuses for management, except for three.

On this record the Court finds and concludes that the Debtor has accomplished a major feat by its confirmed consensual plan. This airline company has reorganized in only three years in an industry where the Bankruptcy Code itself presents a delay in emerging from bankruptcy because of its aircraft leasing provisions. In light of the hard work and sacrifice made by the employees and management, the Board of Directors of the Debtor decided to award various individuals and employee groups bonuses for their efforts. The Debtor urges that there are sound business reasons for the success bonuses where the employees have been essential to the reorganization process.

The Board approved a success bonus of 125,000 shares of Class B common stock for William A. Franke, the Chairman and Chief Executive Officer of the Debtor. The shares of stock are restricted and must be held for at least two years. The value of the shares, and therefore the value of the bonus, is directly linked to the performance of the Debtor post-confirmation.

Mr. Franke came to the Debtor post-petition, on September 17, 1992. Prior to this time, in early 1992, he had turned down a request to work for the Debtor and help it to reorganize. Mr. Franke engineered the important second Debtor–in–Possession financing arrangement, a key element of survival. One of the conditions the lenders required of the Debtor was that Mr. Franke serve as Chairman of the Debtor.

Initially, Mr. Franke created in the Debtor an attractive investment by downsizing the airline and effectively dealing with some $155 million dollars in administrative claims resulting from various claims under Section 1110 of the Bankruptcy Code. The fleet of airlines was downsized from 104 aircraft to 85 aircraft and the dropping of unprofitable routes, such as Hawaii and Nagoya, Japan was accomplished. The number of employees was downsized from 14,500 at the date of filing, to approximately 11,600 on the date of confirmation. Additionally, the employees, including officers and managers, took substantial pay cuts and had their wages frozen at 1991 wage levels in an attempt to help the cash poor Debtor airline remain in business and operational.

When Mr. Franke started with the Debtor it was faced with $155 million dollars in administrative claims resulting under Section 1110 of the Bankruptcy Code. Section 1110 allows a party with a purchase money equipment security interest in aircraft and aircraft parts and equipment to take possession of the equipment, unless any default that occurred before the date of filing is cured before *60 days* after the date of the order for relief. 11 U.S.C. 1110(a)(2)(A). Additionally, any default that occurred post-petition must be cured before the later of *30 days* after the default or the expiration of the *60 day period*. 11 U.S.C. 1110(a)(2)(B). If not dealt with, these claims would have to be paid on the effective date of any confirmed plan and would become a major block to any successful reorganization of the Debtor. Under Mr. Franke's guidance the Debtor was able to settle and reduce all of these large and substantial administrative claims. As the record indicates, many of the settlements were innovative and allowed the Debtor to retain what cash it had available for operations.

It is also clear from the record that many of the parties that were first interested in investing in the Debtor wanted to "lock-up" the Debtor so that it was not in a position to attract any other potential investors while the Debtor had reached profitability and was prepared to emerge as a viable airline in the industry. Mr. Franke resisted this takeover effort, which eventually resulted in the $244 million dollar offer proposed by AmWest Partners and the financial package that became the backbone of the Plan confirmed by the Court on August 10, 1994. From this

record, Mr. Franke has worked long hours during his tenure with the Debtor and his proffered financial opportunities were lost.

The proposed success bonus follows a trend in large successful companies within and out of Bankruptcy. The size of the bonus relates to the success of the company and the bonus in this case is in the form of *restricted stock*. Requiring a CEO to hold a large amount of stock in the company is an obvious incentive to continue experienced management. Here, it should induce Mr. Franke to continue his efforts, as well as keep him as Chairman and CEO of the Debtor for the foreseeable future, all good incentives for an airline flying out of Chapter 11.

The Debtor's Board also approved a proposed success bonus for A. Maurice Myers of $400,000 cash. Many of the letters objecting to the subject bonuses specifically took issue with Mr. Myers receiving such a large cash bonus after being with the Debtor for a relatively short period of time. Mr. Myers was hired by the Debtor on January 1, 1994 to be its Chief Operating Officer. He had previously held the same position at the successful regional airline, Aloha Airlines.

Prior to hiring Mr. Myers, the Debtor had conducted a nationwide search for a COO and Mr. Myers ended up being the first choice after a lengthy interview process. At his previous job, Mr. Myers had a large base salary, a retirement plan, stock options and various other perks. At the time Mr. Myers was being courted, the Debtor was unable to offer a similar package because of its financial situation and its posture in Chapter 11 bankruptcy. The Debtor needed to properly compensate Mr. Myers in order to urge him to make a career move to an organization operating under Chapter 11. The proposed bonus was an effective part of the hiring package provided a plan could be confirmed. In making this offer, the Debtor responded to the market in attempting to hire the most competent people to guide its operations in and out of Chapter 11.

In determining what success bonuses to give to the other officers and managers, the Board also utilized the services of a professional consultant to determine the common practices regarding bonuses in large reorganizations. One of the main concerns of the Debtor was to retain employees who played a key part in the Debtor's reorganization efforts. The officers and managers also put in long hours and took wage cuts and wage freezes during the pendency of this case.

The Debtor has also proposed a $9,500,000 bonus fund to be divided among the rest of the employees structured for $1,000 cash payments. This is *unique* to any large reorganization within the Court's knowledge. The Debtor's new principal, AmWest, urged the "token" bonuses as a "morale booster" to show all employees that their efforts and sacrifices have been appreciated. The Court notes that the employees had their wages cut and frozen at 1991 levels three years ago. However, the proposed bonus is not intended to replace the lost wages or be in place of any new compensation scheme under consideration by the new Board of Directors.

Richard C. Kramer, a member of the Board of Directors and the Chairman of the Compensation Committee of the Debtor testified that the proposed bonuses had nothing to do with a new compensation program which is to begin on January 1, 1995. All but three of the approximately 674 letters from employees objected to the bonuses because of the state of wages during the past three years. The problem in this case is that even though the employees voiced articulate and important concerns, these concerns are totally separate and apart from the issue of the success bonuses. As Mr. Kramer testified, the Board did not consider the wage issue in determining the proposed success bonuses and the success bonuses must therefore stand on their own merit. Three lone letters from employees in reservations, purchasing and scheduling voiced support for the efforts by Mr. Franke and the rest of management, as well as support for all the proposed bonuses. The letters viewed the bonus as just that, a bonus, and the Court agrees.

Robert D. Buford, the head of the west coast executive compensation section of Towers Perrin, an international consulting firm, testified that the proposed management bonuses are common in large reorganizations. According to Buford, the amounts of the

proposed bonuses were in line with bonuses given by other large reorganized companies. (See Trial Exhibit 4). Most, if not all of the companies listed in Exhibit 4 made payments to unsecured creditors that were substantially less than in this case. Additionally, most of the equity security holders in these other bankruptcies recovered little, if anything.

Mr. Buford testified that it was difficult to accurately value Mr. Franke's proposed bonus because of the restriction on sale of the stock, but he did say its value had to be discounted (30%) because of the restriction. In regard to Mr. Myers' proposed bonus, Mr. Buford testified that the size of the bonus was modest. He thought there were obvious business reasons involved and that it makes good business sense to make the payments to Mr. Franke, Mr. Myers and the other officers and managers. Mr. Buford testified in relation to the $1,000 token bonuses that he has never heard of a large reorganization where all of the *non-officer/manager employees* received any type of bonus after reorganization. The Court finds and concludes on this record that these bonuses were able to be proposed because of the hard work and dedication *of all of the employees of the Debtor.*

On this record, the Debtor has exercised its business judgment in proposing the success bonuses. It is a proper use of a Debtor's business judgment to propose bonuses for employees who helped propel the Debtor successfully through the confirmation process. *Matter of Interco,* 128 B.R. 229 (Bankr.E.D.Mo.1991). Confirmation awards to senior executives are common and tend to be very significant amounts. *Id.* at 232. The Court, on this record, on the history and under the present posture of the case, must determine whether the proposed bonuses are reasonable and fair under these circumstances. *Id.* at 234; see attached letter from Allen Corotto, Securities and Exchange Commission.

The Court finds and concludes that the proposed bonuses will aid in continuing the momentum the Debtor has gained up to, and through the confirmation process as the financing arranged with AmWest is successfully closed.

Unfortunately, from the nature of the letter objections of the employees the Court notes that morale appears to be low for that segment of the 11,000 employees at a time when all employees of the Debtor should be congratulating each other on a job well done and working together to ensure future success. It is also regrettable that the issues of bonuses and compensation became linked when, in reality, they are completely separate issues to be dealt with in their own time. The Court finds and concludes that the testimony and exhibits presented by the Debtor at trial show that the proposed success bonuses are reasonable and fair under the history of the case and a valid exercise of the Debtor's business judgment in these matters and are adopted and approved herein.

Accordingly,

IT IS ORDERED granting Debtor's Motion.

ATTACHMENT A

UNITED STATES

SECURITIES AND EXCHANGE COMMISSION

SAN FRANCISCO DISTRICT OFFICE

44 MONTGOMERY STREET

SUITE 1100

SAN FRANCISCO, CALIFORNIA 94104

(415) 705–2470

August 23, 1994

Honorable Robert G. Mooreman

United States Bankruptcy Judge

230 North First Avenue, Room 5000

Phoenix, Arizona 85025

Re: America West Airlines, Inc.

(Chapter 11 Case No. 91–07505–PHX–RGM)

Dear Judge Mooreman:

On August 24, 1994, the court will hear the debtor's noticed motion for authority to pay success bonuses to certain officers and employees of America West Airlines, Inc. The

ATTACHMENT A—Continued

motion is made pursuant to the finding in the court's August 10, 1994, order confirming the plan of reorganization in this Chapter 11 case, that any payment to be made for services rendered in connection with the case or the plan must be approved by the court as reasonable pursuant to the requirements of Section 1129(a)(4) of the Bankruptcy Code.

We do not object to the request for authority to make payments to the indicated officers and employees for extraordinary services rendered in the debtor's reorganization. We take no position on the amounts involved. Since the board acted in the exercise of its business judgment, I think that the debtor should make a factual record so that the court can exercise its discretion in reviewing whether the amounts are reasonable under the particular circumstances applicable to each category. For example, the board's determination of the specific amounts should be explained on the record.

I believe this bankruptcy reorganization has been one of the most successful in which I have been involved. While operating in a highly competitive business environment, management and the debtor's loyal employees took the company from the brink of equipment foreclosures to a successful airline operation. Notable successes would include the proposal and confirmation of a consensual plan; the closing of a substantial investment of new capital; and the participation of public investors in the reorganized company. Indeed, at one time, the debtor reported that it most likely would not be able to propose a plan that included the equity holders, many of whom are employees; yet, this was ultimately accomplished.

As a final comment, I also believe that the success of this case was due in no small part to the court's own perseverance and patience, as well as to the many courtesies extended to all the parties. I personally thank Your Honor for those extended to me and the Commission.

Sincerely,

/s/ Allen F. Corotto

ALLEN F. COROTTO
Chief, Branch of Reorganization

cc: William A. Franke

Martin J. Whalen

Carl A. Eklund

Richard P. Schifter

Benjamin Waisbren

Patrick A. Murphy

Donald C. Fletcher