In re MONTGOMERY WARD HOLDING CORP., et al., Debtors.

The Dai–Ichi Kangyo Bank, Ltd., Chicago Branch, et al., Appellants,

v.

Montgomery Ward Holding Corp., et al., Appellees.

No. CIV.A. 98–52–JJF.

United States District Court, D. Delaware.

Nov. 24, 1999.

John D. Demmy and Eric D. Schwartz, Morris, James, Hitchens & Williams, Wilmington Delaware, Of Counsel: Jonathan· A. Backman and Mai S. Shiver, Rudnick & Wolfe, Chicago, Illinois, for Appellants.

Thomas L. Ambro and Daniel De-Francheschi, Richards, Layton & Finger, Wilmington Delaware, Of Counsel: David S. Kurtz, Richard A. Chesley, and Jeffrey W. Linstrom, Jones, Day, Reavis & Pogue, Chicago, Illinois, for Appellees.

## OPINION

FARNAN, Chief Judge.

Presently before the Court is an appeal by The Dai–Ichi Kangyo Bank, Ltd., The Fuji Bank, Ltd., The Long–Term Credit Bank, Ltd., The Sakura Bank, Ltd. and The Sanwa Bank, Ltd. (collectively the "Bank Group") from the September 17, 1997 Order (the "Order") of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") granting the Debtors' motion to approve various employee incentive programs. For the reasons set forth below, the decision of the Bankruptcy Court will be affirmed.

## BACKGROUND

### I. Statement of Facts

On July 7, 1997 (the "Petition Date"), Montgomery Ward Holding Corp. ("MW Corp.") and Montgomery Ward & Co., Incorporated ("Montgomery Ward") (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors' Chapter 11 cases were consolidated for procedural purposes only and are being administered jointly. The Debtors are continuing in possession of their respective properties and are operating and managing their businesses, as debtors in possession, pursuant to Sections 1107 and 1108 of the Bankruptcy Code. (Appellant's Designation of the Record on Appeal ("App.Rec.") at 1–2).

Pursuant to Section 1102 of the Bankruptcy Code, the United States Trustee for the District of Delaware appointed a statutory committee of unsecured creditors (the "Creditors' Committee") on July 18, 1997. The entities comprising the Bank Group are not members of the Creditors' Committee. However, the members of the Creditors' Committee include five banks, who like the members of the Bank Group, extended financing to the Debtors prior to the Petition Date. (App. Rec. at 50).

On September 3, 1997, the Debtors filed a Motion Of Debtors And Debtors In Possession For An Order (A) Authorizing Key Employee Retention Program, (B) Authorizing Implementation of Severance Program, (C) Approving Amendment To Retirement Security Plan and (D) Granting Certain Related Relief (the "Motion"). (App. Rec. at 1–16; D.I. 9 at Ex. 1). On September 16, 1997, the Bank Group filed an objection to the Motion on the grounds that (a) the Motion provided no factual support for the Debtors' implied assumption that the Debtors can reorganize; (b) the Motion contained no information supporting the Debtors' implied assumption that creditors would benefit from a reorganization; (c) the Motion contained no factual support for the Debtors' assertion that various benefits programs represented necessary and reasonable amounts to pay employees for remaining in the Debtors' employ, and (d) the Motion failed to estimate the cost to the Debtors of the Severance Program if the Debtors liquidated. (App. Rec. at 17–38; D.I. 9 at Ex. 2). On September 17, 1997, the Bankruptcy Court held a hearing on the Motion.

At the hearing, the Debtors offered the testimony of two witnesses, Mr. Robert Kasenter, Montgomery Ward's Executive Vice–President of Human Resources and

Corporate Communications, and Mr. James Giardina, a partner with Ernst & Young who specializes in the compensation consulting area and acts as a consultant to the Debtors. (D.I. 9 at Ex. 4). Mr. Kasenter's testimony focused on the necessity of the proposed employee incentive programs and the manner in which the Debtors developed and adopted the programs. Mr. Kasenter testified that the Debtors have been "targeted by the rest of the industry," and that competitors, aware of the Debtors' vulnerability, have approached the Debtors' best employees and offered them employment contracts. (App. Rec. 62–67). Mr. Kasenter further testified that turnover rates have increased for management and wage level employees by 50% and 33%, respectively, since the Petition Date. (App. Rec. at 65). If the turnover rate could not be stabilized, Mr. Kasenter testified that the Debtors would incur significant expenses associated with replacing employees including search fees, hiring bonuses, relocation expenses and disruption at the store and corporate levels. (App. Rec. at 68–69). With regard to existing employees, Mr. Kasenter testified that as a result of the large amount of publicity surrounding the Debtors' bankruptcy, employees are very insecure and morale is at a low. (App. Rec. at 67). In addition, Mr. Kasenter testified that the employees' stock options have been rendered worthless by the current bankruptcy. Accordingly, Mr. Kasenter testified that the Debtors need to compensate employees for the fact that there is no longer an equity component to their compensation package, and that it is "absolutely essential" to the Debtors' reorganization to keep certain "key executives" in the Debtors' employ. (App. Rec. at 59, 60, 61, 63, 74).

To effectuate the goal of retaining key employees during the reorganization process, Mr. Kasenter testified that the Debtors decided they needed a Retention Incentive Plan. In selecting the employees who would be eligible to participate in the Retention Incentive Plan, the Debtors comprised a list of "absolutely essential" employees. From this list, the Debtors went through a "sifting process," the result of which was a list of employees representing about 10% of their management force. (App. Rec. 70–71). Mr. Kasenter testified that the Debtors then worked with Ernst & Young, to determine what it would take to retain these key employees. In making this determination, the Debtors considered the types of programs utilized by other Chapter 11 and non-Chapter 11 retailers. (App. Rec. at 70–72, 82). Mr. Kasenter testified that the resulting incentive program was negotiated with the Creditors' Committee and was a product of "certain business judgments based upon what we thought we could afford." (App. Rec. at 71, 72, 82 and 97.)

Following Mr. Kasenter's testimony, Mr. Giardina testified as to the reasonableness of the Employee Incentive Programs in comparison with other companies' incentive programs. Mr. Giardina testified that Ernst & Young assessed the competiveness of the Debtors' current compensation package based on several survey sources that are commonly used for these types of analyses, as well as some independent proxy analysis reviews of retailers. (App. Rec. at 119–121). As a result of their evaluation, Ernst & Young concluded the Debtors' compensation was significantly trailing the marketplace. In addition, Mr. Giardina testified that the Debtors were being "targeted at a very rapid rate" by outside organizations, search groups, executive recruiter agencies, as well as direct competitors. To this effect, Mr. Giardina testified "of all the retail organizations that I have dealt with in Chapter 11, they probably were under the gun more than any other I had encountered, which, obviously, became a factor when we started to put our recommendations together." (App. Rec. at 122–23). Based on their evaluation and observations, Ernst & Young recommended that the Debtors implement a retention program as quickly as possible to (1) motivate people to stay with the company and (2) mitigate the total loss

of incentive compensation. To this effect, Ernst & Young recommended that the Debtors' reinstate an annual incentive potential tied to some Chapter 11 performance hurdle and that they formalize severance arrangements for a broad class of employees to give them some type of comfort level with the company. Ernst & Young did not recommend a performance based program, because "the goal was to retain employees, not motivate them to achieve certain levels of operating performance." (App. Rec. at 124–126).

The resulting employee incentive programs developed by the Debtors include three separate component programs: (1) the Retention Incentive Plan, (2) Employee Severance Program, (3). amendment to the Retirement Plan. Under the Retention Incentive Plan, an employee would be eligible for a retention incentive payment if the employee remained actively employed by the Debtors throughout the period extending from the date of approval of the Motion through and including December 31, 1998. (App. Rec. at 5). The Retention Incentive Payment was made available to around 500 key management employees or approximately 10% of the Debtors' management employees (managers through vice presidents). (App. Rec. at 6). The Debtors estimated that, if all participating employees were to receive Retention Incentive Payments, the aggregate amount of payments that would be made under the Retention Incentive Plan would be approximately 17.6 million. Due to a normal employee attrition rate of 20%, however, it is anticipated that the amount of payment would be much lower (approximately $13–14 million). (App. Rec. at 72).

The Severance Program consisted of two separate components. Employees eligible for the first component of the program included all "bonus-eligible" management employees in the Debtors' salary grades 15 and above, other than members of the Executive Committee. Under this component, any eligible employee whose employment was terminated by the Debtors for a reason other than death, disability or "cause" was to be eligible to receive a Severance Benefit ranging from one week of pay for each year of service to seventy-eight weeks of pay. Approximately 930 management employees were to be eligible to participate in the first component of the Severance Program. (App. Rec. at 7).

Employees eligible for the second component of the Severance Program included management employees in the Debtors' salary grades 14 and below and full-time and part-time wage employees with two or more years of service. Pursuant to this component of the Severance Program, any eligible employee whose employment was terminated by the Debtors for a reason other than death, disability, "cause" or the shutdown of an entire location, would be eligible to receive a Severance Benefit ranging from two weeks of pay to a maximum of 26 weeks of pay. (App. Rec. at 7). The Debtors estimated that if all employees were to receive the Severance Benefits, the aggregate amount of payments that would be made under the Severance Plan, once WARN Act payments were deducted, would be approximately $47–50 million. (App. Rec. at 76). However, because some employees would be likely to leave before the severance period ended, the Debtor estimated the amount of participating employees to be approximately 50%. (App. Rec. at 79).

Under the Retirement Plan amendment, employees who were not included in other incentive programs and experienced a job loss as a result of the shutdown of an entire location of the Debtors would receive the payment of an additional pension benefit. (App. Rec. at 8). The Debtors estimated that potential payment under this amendment would total approximately $10 million during the remaining pendency of the Chapter 11 cases. Because any benefits paid pursuant to this amendment would be paid from the Retirement Plan, there would be no cash payment by Montgomery Ward as a result of this benefit. (App. Rec. at 8).

The Bank Group cross-examined the Debtors' witnesses at the hearing and argued that the Debtors' Motion and Evidence failed to support the reasonableness of the employee incentive programs. The Bank Group did not present any additional evidence to contradict the Debtors' evidence.

## II. The Bankruptcy Court's Order

At the conclusion of the evidence presented by the Debtors, the Bankruptcy Court granted the Debtors' Motion. In so doing, the Bankruptcy Court observed that the Debtors were a "company under siege" and "needed a very strong boost in terms of saying to its employees that we have a lot of confidence· that we can turn this thing around and reorganize and we're going to demonstrate that confidence by making it in your best interest to stay with us." (App. Rec. at 166). The Court further emphasized that the Debtors were receiving a large amount of negative publicity. While the Court noted that the retention and severance programs were "on the high side," in comparison with other Chapter 11 retailers, the Court found that the programs were "absolutely essential" because of the unique problems confronting the Debtors. (App. Rec. 162, 166). The Court further noted that "in every major case that I have, particularly, the retail cases, we have this type of a program early on in the case because of the free-fall chapter 11 problems that we have, including the public's perception and creditors, vendors, et cetera's perception of this company." (App. Rec. at 166–67). Weighing the benefits of the programs to both the Debtors and its creditors, the Court concluded:

"So, in summary, it is my view that the worst thing that could happen to this company is to deny the motion. And I would think that such a denial would only heighten the prospects for a liquidation result, and, therefore, that granting the motion is the best thing that can be done at this stage to enhance the prospects for a successful reorganization..."

(App. Rec. at 167).

Based on the legal and factual bases set forth in the Motion and at the Hearing, the Court granted the Debtors Motion and authorized the Debtors to implement the various plans. (App. Rec. at 39–40; D.I. 9 at Ex. 3).

## DISCUSSION

### I. Jurisdiction and Standard of Review

 Under 28 U.S.C. § 158(a), this Court has jurisdiction to adjudicate appeals from final judgments, orders and decrees of bankruptcy judges. Pursuant to Federal Rule of Bankruptcy Procedure 8013, the Court "may affirm, modify, or reverse a bankruptcy judge's judgment, order or decree or remand with instructions for further proceedings." Fed. R. Bankr.P. 8013. In reviewing a case on appeal, the bankruptcy court's factual determinations are subject to deference and shall not be set aside unless clearly erroneous. *Id.; see In re Gutpelet,* 137 F.3d 748, 750 (3d Cir.1998). However, a bankruptcy court's conclusions of law are subject to plenary review and are considered de novo by the reviewing court. *Meespierson, Inc. v. Strategic Telecom, Inc.,* 202 B.R. 845, 847 (D.Del.1996). Mixed questions of law and fact are subject to a "mixed standard of review" under which the appellate court accepts finding of "historical or narrative facts unless clearly erroneous, but exercise[s] plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts." *Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 641–42 (3d Cir.1991) (citing *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 101–02 (3d Cir.1981)), *cert. denied,* 503 U.S. 937, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992).

 Specifically, with respect to Section 363(b) motions seeking approval for the use, sale or lease of property of the estate

other than in the ordinary course of business, the bankruptcy court has considerable discretion. *See In re 240 North Brand Partners*, 200 B.R. 653, 656 (9th Cir. BAP 1996); *In re Crutcher Resources Corp.*, 72 B.R. 628, 631 (Bankr.N.D.Tex.1987). Under these circumstances, courts have recognized that the bankruptcy court's decision may only be overturned on appeal if its decision was an abuse of discretion. *In re 240 North Brand Partners*, 200 B.R. at 656.

## II. Whether the Bankruptcy Court Erred in Approving the Debtors' Motion for Authorization to Implement the Retention, Severance and Retirement Programs

In appealing the Bankruptcy Court's Order authorizing the Debtors to implement the retention, severance and retirement programs, the Bank Group raises two issues. First, the Bank Group contends that the Bankruptcy Court erred, as a matter of law, in approving the employee incentive programs, because the Debtors presented no evidence that they possessed a reasonable prospect of successfully reorganizing. Second, the Bank Group contends that the Bankruptcy court erred in approving the Motion, because the Debtors' did not present sufficient evidence to permit the bankruptcy court to find that the employee incentive programs were reasonable and necessary to protect the Debtors from further losses of their key employees.

In response to the Bank Group's arguments, the Debtors contend that there is no requirement under Section 363(b) for the Debtors to show a likelihood of successfully reorganizing. The Debtors further contend that there was ample evidence offered to the Bankruptcy Court through the testimony of Mr. Kasenter and Mr. Giardina to establish "a sound business purpose" for the employee incentive programs. The Court will address each of the parties contentions in turn.

### A. Whether the Debtors Were Required to Present Evidence That They Possessed a Reasonable Prospect of Successfully Reorganizing

In pertinent part, Section 363(b) provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions. *See In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D.Del.1991); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir.1983); *In re Lady H Coal Co., Inc.*, 193 B.R. 233, 243 (Bankr.S.D.W.Va.1996); *In re WBQ Partnership*, 189 B.R. 97, 102 (Bankr. E.D.Va.1995); *In re Indus. Valley Refrig. & Air Cond. Supplies*, 77 B.R. 15, 21 (Bankr.E.D.Pa.1987).

In evaluating whether a sound business purpose justifies the use, sale or lease of property under Section 363(b), courts consider a variety of factors, which essentially represent a "business judgment test." *See* Collier on Bankruptcy § 363.02 (15th ed.1997). In *In re Lionel Corp.*, the Court of Appeals for the Second Circuit listed several factors which a bankruptcy court may consider in its Section 363(b) analysis.[1] Specifically confronted with the sale of assets under Section 363(b), the Second Circuit stated:

> In fashioning its findings, a bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather, he should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike. He might, for

---

1. The *Lionel* court's approach to determining whether a sound business purpose exists to justify a Section 363(b) motion was adopted by this Court, in the context of a sale of assets, in *In re Delaware & Hudson Ry. Co.*, 124 B.R. at 176.

example, look to such relevant factors as the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions, and most importantly perhaps, whether the asset is increasing or decreasing in value.

722 F.2d at 1071. In delineating these factors, the Second Circuit cautioned that "this list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge." *Id.*

■ Based on *In re Lionel Corp.*, the Bank Group argues that the Debtor is required to establish that they possessed a reasonable prospect of successfully reorganizing. (D.I. 8 at 14). The Court disagrees with the Bank Group's interpretation of *In re Lionel Corp.* as imposing a requirement that the Debtor establish a reasonable prospect of successfully reorganizing. The *Lionel* court expressly stated that its list of factors was to "provide guidance" to the bankruptcy judge and prefaced its list by stating that a bankruptcy judge "might, for example look to such relevant factors as ..." 722 F.2d at 1071. Further in discussing the debtor's prospects for reorganization, the *Lionel* court stated that "a debtor applying under 363(b) carries the burden of demonstrating that a use, sale or lease out of the ordinary course of business will aid the debtor's reorganization ..." *Id.* Thus, while the *Lionel* court indicated that the effect on reorganization of a use, sale or lease out of the ordinary course of business may be considered by a bankruptcy judge, the *Lionel* court did *not* require debtors to establish a reasonable prospect of successful reorganization—a requirement which the Court believes is quite different, and

indeed more stringent, than a showing that a use, sale or lease under 363(b) "will aid the debtor's reorganization."

In addition to the *Lionel* decision, the Bank Group directs the Court to *In re Fremont Battery Co.*, 73 B.R. 277 (Bankr. N.D.Ohio 1987), *In the Matter of Interco, Inc.*, 128 B.R. 229 (Bankr.E.D.Mo.1991), and *In re America West Airlines, Inc.*, 171 B.R. 674 (Bankr.D.Ariz.1994), to support its proposition that the Debtors must show a reasonable prospect of successfully reorganizing to justify its Section 363(b) motion. The *Fremont* decision expressly relies on the factors set forth in the *Lionel* decision. Consistent with the Court's interpretation of the *Lionel* decision, the Court concludes that the *Fremont* decision does not impose a requirement on the Debtors to show a successful prospect of reorganization.

As to the *Interco* and *America West Airlines* decisions, both of which deal with employee retention/bonus type plans, the Court concludes that neither case imposes a requirement upon a debtor to demonstrate a reasonable probability of successful reorganization. To the contrary, rather than impose blanket requirements on a debtor, both *Interco* and *America West Airlines* acknowledge that the determination of whether to approve such plans turns on the facts and circumstances of each particular case. *In re America West Airlines*, 171 B.R. at 678–679; *In the Matter of Interco*, 128 B.R. at 233 ("As is so often the question for the Bankruptcy Court, each case must be determined on its own in the circumstances which are presented to the Court."). Accordingly, the Court does not read these decisions to support the Bank Group's argument.

■ In addition to the lack of case law supporting the Bank Group's proposition that the Debtors are required to show a reasonable prospect of successfully reorganizing, the Court further observes that such a requirement would be at odds with the purposes underlying Section 363(b). As the *Lionel* court observed, Section

363(b) should be interpreted liberally to provide a bankruptcy judge with "substantial freedom to tailor his orders to meet differing circumstances" and to avoid "shackl[ing] [the judge] with unnecessarily rigid rules ..." 722 F.2d at 1069. At the same time, the *Lionel* court recognized that the Section 363 does not grant the bankruptcy judge "carte blanche." *Id.* Accordingly, it is the Court's view that the approach which best strikes this balance, is the approach taken by the *Lionel* court—a bankruptcy court may consider several factors, none of which are dispositive in and of themselves, and all of which are intended to merely guide the bankruptcy judge in assessing a Section 363(b) motion in light of the particular facts and circumstances of each case.

B. *Whether the Debtors Presented Sufficient Evidence to Establish a Sound Business Purpose for the Retention, Severance and Retirement Program*

█ Having concluded that the Debtors are not required to demonstrate a reasonable prospect of successfully reorganizing as a prerequisite to the Bankruptcy Court's approval of their Section 363(b) Motion, the Court will turn its attention to whether sufficient evidence existed for the Bankruptcy Court to conclude that a sound business purpose justified the Debtors' employee incentive programs. As this Court and the *Lionel* court have recognized, the debtor carries the burden of demonstrating that a use, sale or lease will assist the debtor's reorganization, however, an objectant is required to produce some evidence supporting its objections. *In re Delaware & Hudson Ry. Co.,* 124 B.R. at 176; *In re Lionel Corp.,* 722 F.2d at 1071.

█ In this case, the Bank Group failed to produce any evidence at the hearing controverting the testimony of the Debtors' witnesses. Moreover, the Court concludes that the Debtors' presented ample evidence through the testimony of Mr.

Kasenter and Mr. Giardina that a sound business purpose justified the Debtors employee incentive programs. The Court sees no need to recount this evidence at length, as it is contained in the record and is undisputed; however, the Court notes that both Mr. Kasenter and Mr. Giardina testified at length about the Debtors' need to implement these programs to stabilize the turnover rate, boost employee morale and retain key employees who would be essential to the Debtors' reorganization. Further, both Mr. Kasenter and Mr. Giardina testified that, although on the high side, the Debtors in their business judgment believed the benefits programs were reasonable in light of the circumstances surrounding the Debtors' bankruptcy including the inordinate amount of negative publicity generated by the Debtors' Chapter 11 filing. In articulating its ruling on the Debtors' Motion, the Bankruptcy Court credited the testimony of Mr. Kasenter and Mr. Giardina, considered the particular facts and circumstances of the case, including the negative publicity generated by the Debtors' bankruptcy and its effect on employees, and found, based on the uncontroverted evidence, that such incentive programs would assist the Debtors' in retaining key employees and successfully reorganizing. Accordingly, under these circumstances, the Court cannot conclude that the Bankruptcy Court abused its discretion by granting the Debtors' Motion.

## CONCLUSION

For the reasons discussed, the Bankruptcy Court's September 17 Order granting the Debtors' Motion to approve various employee incentive programs will be affirmed.