**In re AEROVOX, INC., Debtor.**

**No. 01–14680–JNF.**

United States Bankruptcy Court,
D. Massachusetts.

Oct. 31, 2001.

Harold B. Murphy, Hanify & King, Boston, MA, for Debtor.

William R. Baldiga, Brown, Rudnick, Freed & Gesmer, Boston, MA, for Fleet Capital Corp.

Jonathan D. Yellin, Riemer & Braunstein, LLP, Boston, MA, for KeyBank National Assoc.

Kerry S. Kehoe, Holland & Knight, Boston, MA, for Official Committee of Unsecured Creditors.

Paula R.C. Bachtell, Boston, MA, for United States Trustee.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

## I. INTRODUCTION

The matters before the Court are the "Amended Motion by Debtor for Authorization to Implement Employee Retention and Severance Program and to Reject Certain Executory Contracts" (the "Amended Motion"), the Creditors' Committee's Opposition and the Joint Objection by KeyBank National Association and Fleet Capital Corporation. Pursuant to its Amended Motion, Aerovox, Inc. seeks authority, under 11 U.S.C. §§ 105(a) and 363(b), to implement a Key Employee Retention Program ("KERP"), which consists of a bonus plan and a severance package for four executives. The Court held an evidentiary hearing on the Amended Motion and the objections on October 23, 2001. The issue before the Court is whether to grant the Amended Motion and approve the KERP for the four executives, in full, in part, or not at all.[1]

## II. PROCEDURAL BACKGROUND

On June 6, 2001, Aerovox, Inc. (the "Debtor") filed a voluntary Chapter 11 petition. The United States trustee appointed an Official Committee of Unsecured Creditors (the "Committee") on June 19, 2001. To date, the Debtor is operating its business as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108. The Debtor, a manufacturer of electrostatic and aluminum electrolytic capacitors, is a publicly traded company that owns manufacturing facilities in New Bedford, Massachusetts and Huntsville, Alabama and employs approximately 400 workers.[2]

The Debtor filed a Motion for Authorization to Implement Employee Retention Program and to Reject Certain Executory Contracts (the "Motion") on September 14, 2001. In its Motion, the Debtor asserted that its proposed KERP is necessary in order to prevent certain critical employees from terminating their employment during the Chapter 11 proceeding. The Court heard the Motion on October 11, 2001 and approved the KERP with respect to 17 mid-level managers as the Debtor and the Committee had reached a stipulation as to those employees. The Court continued the hearing from October 11, 2001 to October 23, 2001 to consider the KERP for four senior executives: 1) Robert Elliot, President and Chief Executive Officer; 2) F. Randal Hunt, Senior Vice President and

---

1. As will be explained below, the Debtor in its original Motion for Authorization to Implement Employee Retention Program and to Reject Certain Executory Contracts sought to implement a KERP for 17 middle management employees in addition to its four senior executives. The Committee and the Debtor reached a stipulation with respect to, and the Court approved the retention program for, the 17 middle management employees. The Amended Motion, therefore, only concerns the four senior executives.

2. The Debtor also has two wholly owned subsidiaries; Aerovox de Mexico, S.A. de C.V. ("Aerovox Mexico") and BHC Aerovox Ltd ("Aerovox England"). These subsidiaries operate two manufacturing facilities in Mexico and one manufacturing facility in England, respectively, and employ approximately 1,100 workers.

Chief Financial Officer; 3) Martin Hudis, Senior Vice President of Technology; and 4) Diana M. Lane, Director of Human Resources, (collectively, the "Key Employees").

In its original Motion, the Debtor indicated that the filing of the Chapter 11 case resulted in the elimination of certain economic protections that the eligible employees, including the Key Employees, had enjoyed prior to the filing of the bankruptcy petition. It sought to compensate the eligible employees for their hard work, for going above and beyond their original assigned duties, and as an incentive to remain with the Debtor during the Chapter 11 case. The Debtor summarized the incentives it designed as follows: 1) to keep the eligible employees, including the Key Employees, in the Debtors employ; 2) to compensate the eligible employees, including the Key Employees, for assuming "additional administrative and operational burdens imposed on the Debtor by its Chapter 11 case;" and 3) to allow the eligible employees, including the Key Employees, to use "their best efforts to ensure the maximization of estate assets for the benefits of creditors." *Debtor's Motion,* p. 3. The Debtor asserted that it "believes that the implementation of the KERP will not only be beneficial to its estate and creditors, but [is] essential to maximizing creditors' recoveries," *id.,* p. 4, particularly as all claims under existing employment contracts would have to waived. *Id.* at 5.

On October 9, 2001, the Committee filed an Opposition to the Debtor's Motion, asserting that the Debtor failed to demonstrate a sound business reason for implementing the KERP. The Committee maintained that the KERP was unnecessary and excessive and was not designed to achieve a particular result. Additionally, KeyBank National Association ("KeyBank") and Fleet Capital Corporation ("Fleet") filed a Joint Objection on October 9, 2001. They argued that the Debtor had failed to substantiate why the estate should incur the potential additional administrative expense associated with the KERP. Both KeyBank and Fleet expressed concern about binding the estate to potential administrative claims, without first "providing any evidence that any 'key' personnel have either threatened to leave or are planning to leave prior to the Debtor's submission of a prospective sale or equity infusion for approval by this Court." *Joint Objection,* p. 3.

Prior to the October 23, 2001 hearing, the Debtor filed its Amended Motion, which was submitted at least partially in response to the Committee's Opposition. In the Amended Motion, the Debtor attempted to address some of the Committee's concerns, as the Debtor voluntarily reduced the amount of the package it proposed for the Key Employees. In the Amended Motion, which was supported by the Affidavit of Sherel Horsley, the Chairman of the Board of Directors, the Debtor represented, among other things, that since January 1, 2001 thirty-seven employees voluntarily or involuntarily have left the company. The Debtor stated that the Key Employees have assumed additional duties and are working longer hours to make up for the reduced workforce. It indicated the following:

> Mr. Hunt has fulfilled the duties of both chief financial officer and corporate controller. Mr. Elliot has served, in addition to being the chief executive officer, as director of sales and operations. Upper Management has also been required to expend considerable efforts during the pendency of the bankruptcy case in: interacting with prospective purchasers of the Debtor's assets; responding to inquiries of the Official Committee of Unsecured Creditors....; participating

in litigation with Fleet; and ensuring the Debtor's compliance with bankruptcy operation guidelines.

*Amended Motion*, p. 4. The Debtor described the Amended KERP for the Key Employees as follows:

(i) the allowance of a retention plan for Upper Management [the Key Employees] in an amount equal to three months' current salary payable upon the earlier of:

a) involuntary termination of employment;

b) the sale of all or substantially all of the Debtor's assets; or

c) June 6, 2002; and

(ii) the allowance of a severance plan for Upper Management, calculated one year following termination of employment, equal to the lesser of:

a) the difference between: 1) the annual salary payable to the affected employee at the time of termination, and 2) the amount earned by such employee from alternative employment in twelve months subsequent to termination; and

b) an amount equal to six months' salary of the affected employee.

*Debtor's Amended Motion*, p. 3. Moreover, the Debtor represented that all preexisting employment contracts held by the Key Employees would be deemed rejected and any claims associated with those contracts would be deemed waived. *Amended Motion*, p. 5.

**3.** The original KERP had only proposed payment upon a salary decline of 20% or more.

**4.** KeyBank's counsel did not appear at the hearing. Since its original objection was superceded when the Debtor filed the Amended

## III. ARGUMENTS MADE AT THE OCTOBER 23, 2001 HEARING

Although the Creditors' Committee did not file a formal written response to the Amended Motion, counsel to the Committee voiced two objections at the hearing conducted on October 23, 2001. The first objection was that the KERP is structurally flawed. The Committee, rightfully concerned about potential liability, questioned when the severance package would be triggered as the Debtor's Motion only stated "upon involuntary termination." During the hearing, this objection was resolved by the parties, as they agreed that the KERP would not become effective if termination was "for cause, death or disability." In addition, the parties agreed that the maximum liability under the severance package would be six months salary, and the KERP would become effective upon any decline in the executives' salary.[3] The Committee's second objection, that the KERP is not an exercise of the Debtor's sound business judgment, remained unresolved, and is the subject of this Memorandum.

At the hearing, Fleet voiced a limited objection to the proposed amended KERP.[4] It asserted that any potential claims should not be charged back to Fleet pursuant to 11 U.S.C. § 506(c) in the event the case is converted to a Chapter 7 case. Fleet, however, agreed with the Debtor that the proposed KERP is a reasonable exercise of sound business judgment.

The Debtor compared the new and old KERP. Under the amended KERP, the Debtor estimated its potential liability to be $625,000.[5]

Motion, KeyBank has not officially objected on the record to the Amended KERP.

**5.** The total potential liability under the first proposed KERP was estimated to be approximately $1,250,000.

## IV. THE EVIDENCE

### A. *Undisputed Facts*

All parties agree that the ultimate goal and most feasible solution of the Chapter 11 reorganization process for Aerovox, Inc. is to find a buyer for its assets. At the time of the hearing, the Debtor had solicited and received six offers for the purchase of the company. Because the offers were only recently received, the Debtor has not fully evaluated them. The parties agree that the bidding process may take several months as numerous negotiations will be conducted in an effort to obtain the maximum sale price for the assets. The next few months, therefore, will be crucial to the Debtor's success in this Chapter 11 case.[6]

### B. *The Salary Histories of the Key Employees*

The Debtor introduced evidence regarding the salary histories and benefits of the Key Employees. Below is a chart detailing this information:

| Employee | Dec. 1999 | Feb. 2000 | May 2000 | July 2000 | June 2001 |
|---|---|---|---|---|---|
| Robert D. Elliot | $255,000 | —— | —— | $300,000 | $400,000 |
| F. Randal Hunt | $105,000 | $120,000 | $135,000 | —— | $155,000 |
| Martin Hudis | $158,000 | | —— | $162,000 | $200,000 |
| Diana M. Lane | $ 90,000 | —— | —— | $ 92,500 | —— |

A review of the chart indicates that three of the four Key Employees received a raise immediately before the filing of the Chapter 11 petition. Benefits, such as company cars, life insurance and vision care, however, were all discontinued in June of 2001 in an effort to reduce costs during this troubling economic period.

### C. *Testimony of Sherel Horsley*

Sherel Horsley, a retired Texas Instruments Inc. executive with 35 years of senior management experience with that company, testified that he has served on the Debtor's Board of Directors (the "Board") for four years. He testified not only about his employment and educational background, but also about the collective experience of the entire Board. Five members of the Debtor's Board of Directors are so-called "Outside Directors." Mr. Horsley attached biographies of the Outside Directors to his Affidavit. Mr. John F. Brennan, Dean of the Sawyer School of Management at Suffolk University since 1992, currently serves as a director for The Timberland Company, Data Storage Corporation and Lite Control Corporation. Mr. Dennis Horowitz, Chairman, President and Chief Executive Officer of Wolverine Tube, Inc., currently serves as a director of Superconductor Technologies, Inc. and Wolverine Tube, Inc. Mr. William G. Little, President and Chief Executive Officer of Quam Nichols Co., is the former Chairperson of the United States Chamber of Commerce. Mr. Benedict P. Rosen, a previous Chairman and Chief Executive Officer of AVX Corporation, currently serves on the Board of Directors of Nordson Corporation and as a Senior Managing Director of Kyocera Corporation.

Mr. Horsley testified that the Board met five times before submitting the original proposed KERP to this Court and that the Board's decision was based upon its "collective judgment." Accordingly to Mr.

---

**6.** The Debtor has retained the investment banking firm of Loeb Partners to explore restructuring alternatives.

Horsley, the Board voted on the original KERP and the vote was unanimous, with one minor exception. Mr. Enrique Sanchez, the Debtor's Marketing Manager and one of an unspecified number of "Inside Directors," was on a cellular phone and was disconnected before the actual vote could be taken.

According to Mr. Horsley, the Board concluded that the KERP is "fair and equitable" and that continuity of management is needed to preserve the value of the company. Mr. Horsley indicated that the Board feared that if the Key Employees were to find alternative employment, the value of the company would erode, adversely affecting creditors.

Mr. Horsley testified in detail regarding the due diligence conducted by the Board in reaching its decision. The Board determined that the Key Employees are critical to maintaining a "team focus." Additionally, he represented that the Board's primary goal in approving the KERP is to retain the Key Employees. Moreover, in the Board's view, replacing the Key Employees would cause the Debtor to incur significant costs. Mr. Horsley testified that the process of replacing any one of the Key Employees could cost up to one years' salary in order to cover the cost of a headhunter and other recruitment expenses. He added that, even if the Debtor were to find qualified replacements, it would not be able to quickly get these new employees "up to speed." This cost-benefit analysis weighed heavily into the Board's ultimate decision.

In addition to the goal of retaining the Key Employees, the Board considered the additional duties they have undertaken as a result of the Debtor's Chapter 11 case. Mr. Horsely testified that the Debtor's workforce has been reduced during the past year. He emphasized that the Key Employees have been compelled to work longer hours and assume more job responsibilities. He indicated that while the KERP was not designed solely to compensate the Key Employees for assuming additional responsibilities, the need for and willingness of the Key Employees to assume those duties was a factor in the Board's ultimate decision.

The Board did not meet to discuss the amended, reduced KERP and consequently did not vote on it. Mr. Horsley, however, testified that he discussed the proposal with Debtor's counsel and Mr. Elliot. The Board was aware of the ongoing negotiations between the Debtor and the Committee that resulted in the amended KERP, which reduced the Debtor's potential liability from that under the original KERP.

Mr. Horsley stated that he had yet to review any of the six offers that had been received by the Debtor at the time of the hearing. Therefore, he could not state which offers, if any, were conditioned upon the retention of the current management team.

### D. *Testimony of Robert Elliot*

Robert Elliot, President and Chief Executive Officer of the Debtor, testified in detail about his substantial employment experience. He stated that he has worked for a variety of companies, including General Electric and other companies listed on the New York Stock Exchange. He testified that he has been recruited several times in the past and has filled a wide variety of executive positions at large companies. Additionally, he recruited the current management team.

He also testified about his current job responsibilities and how those duties have increased since the filing of the Chapter 11 petition. According to Mr. Elliot, when he began working at Aerovox, Inc., it was experiencing financial problems. Never-

theless, he stated that he was satisfied that his compensation and benefits package provided him with financial security. In addition to receiving many other benefits, he had a severance package equal to 18 months of salary. The Board subsequently increased his severance package, providing him with three times his annual salary plus a target bonus and benefits for one year. Mr. Elliot correctly observed that when the Debtor filed its Chapter 11 petition in June of this year, the financial protection he secured for himself "disappeared." [7]

Although he previously told the Board that he "wouldn't leave until this process was concluded," Mr. Elliot stated that he made this representation with the understanding that he would have be given some level of financial protection. He testified that, if he is not afforded some level of protection in addition to his current salary, he will be forced to seek alternative employment. He also testified that he has spoken with the other three Key Employees and was informed by them that they would be seeking alternative employment also if the Court were to disapprove the proposed KERP, although none have yet to initiate a job search.

Because the Debtor is actively seeking higher offers to purchase the company, both Mr. Horsley and Mr. Elliot testified that this negotiation stage is critical to obtaining the maximum sale price. In addition, Mr. Elliot testified that all potential offerors, in conducting their due diligence, have asked whether the current executives will remain. Nonetheless, Mr. Elliot stated that the Debtor has yet to fully evaluate the offers received to date, and it is uncertain whether any of the offers are conditioned upon the current executives remaining. It is clear, however, that the bidding process will take several months.

## V. ANALYSIS

### A. *Applicable Case Law*

■ Section 363(b) of the Bankruptcy Code provides that a "trustee [or debtor-in-possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate," 11 U.S.C. § 363(b), when a sound business purpose justifies such action. *See In re Delaware & Hudson Ry.*, 124 B.R. 169, 176 (D.Del.1991); *Stephens Industries, Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir.1986) and *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D.Pa.1991). In determining whether to approve the business decision of a debtor-in-possession or a trustee, the "bankruptcy court sits as an overseer of the wisdom with which the bankruptcy estate's property is being managed by the trustee or debtor-in-possession, and not, as it does in other circumstances, as the arbiter of disputes between creditors and the estate." *In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2nd Cir.1993). In addition, a debtor's business decision "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" *In re Logical Software*, 66 B.R. 683, 686 (Bankr.D.Mass.1986) (citations omitted).

■ Bankruptcy courts will approve key employees retention programs if the Debtor has used proper business judgment in formulating the program and the court finds the program to be "fair and reasonable." *In re Interco Inc.*, 128 B.R. 229, 234 (Bankr.E.D.Mo.1991). "The determination of whether to approve such plans turns on the facts and circumstances of

---

**7.** *See In re Mammoth Mart, Inc.*, 536, F.2d     950, 952 (1st Cir.1976).

each particular case." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 154 (D.Del.1999) (upholding the bankruptcy court's approval of employee incentive program for "absolutely essential" employees, comprising approximately 10% of the workforce, after finding some key executives had been approached by competitors).

In *Interco,* the bankruptcy court approved a retention plan, linked to performance, for 130 "critical executives," valued at a projected cost between approximately $1.8 million and $5.6 million. 128 B.R. at 232. In addition, the court approved awards in the amount of $2 million to two executives, payable only in the event the Chapter 11 plan was confirmed while the individuals were still in the debtor's employ. *See id.* In exchange, the two executives waived their claims under their current employment contracts pursuant to which they would have had potential claims against the debtor, in excess of the proposed award, in the event of a "change in control." *See id.* The debtor in that case determined, and the court agreed, that based upon sound business judgment, the payments were necessary to a successful reorganization. *See id.* at 233.

Similarly, in *In re America West Airlines, Inc.,* 171 B.R. 674 (Bankr.D.Ariz. 1994), the court approved certain success bonuses, having found that debtor exercised its sound business judgment. The court found that the standard to be met is whether the proposed bonuses "are reasonable and fair under these circumstances." *Id.* at 678 (citing *Interco,* 128 B.R. at 234). In the Arizona case, wages had been frozen at the company for some time and all employees had, in the eyes of the Board, gone above and beyond what was necessary to facilitate the reorganization. The Board utilized the services of a professional consultant to determine ap-

propriate bonuses. *See id.* at 677. The Debtor, in its plan, proposed payments not only to executives, but to all employees, a proposal the court found to be "unique" in a large reorganization. *See id.* The court, however, found all the proposed bonuses to be fair and reasonable, even as to non-key personnel, because of the "dedication *of all of the employees of the Debtor." Id.* at 678 (emphasis in original).

## B. *Discussion*

■ Upon consideration of the evidence and applicable legal principles, the Court finds that the Debtor has sustained its burden of establishing that it properly exercised its business judgment and that the KERP is fair and reasonable under the circumstances. The testimony of Mr. Horsley established that the Board utilized sound business judgment in evaluating the need for and financial implications of the KERP. Weighing the costs and benefits of the KERP, the Board met five times before approving the original KERP outlined in the Debtor's first Motion. The Board utilized it members' collective knowledge, experience and judgment in formulating the KERP. It designed the financial incentives of the KERP while considering the potential risks of liability, the Debtor's financial restrictions, the need to continue stable operations during the Chapter 11, and the goal of obtaining the best possible sale price for the assets. The Board reduced the potential risk of liability to the estate by requiring a waiver of any claims that may have resulted from the rejection of prepetition employment contracts. Moreover, the Board, through Mr. Horsley, proposed a less costly KERP than that originally considered in response to the Committee's Opposition.

The Debtor established that the Key Employees perform numerous critical functions in this Chapter 11 case and that

their continued employment is important to the operations of the Debtor and the maximization of offers for the Debtor as a going concern. The Court finds that Mr. Elliot's continued leadership is vital at this crucial stage of the case and that the services of the management team that he recruited will further the objective to sell the company at an optimal price. The evidence established that the Key Employees are likely to consider exploring other employment alternatives in the event the KERP is not approved.

The Committee did not introduce any evidence to rebut the Debtor's evidence showing that the KERP is an exercise of sound business judgment by the debtor-in-possession. The Committee did not introduce evidence of the potential effect of the KERP on the likely dividend to unsecured creditors in this case, although admittedly it might be premature and speculative to attempt such an analysis. In any event, the court in *Montgomery Ward* specifically rejected "a reasonable prospect of successfully reorganizing" as a factor in evaluating the debtor's business judgment. 242 B.R. at 154.

Two subsidiary issues remain: whether the Debtor may seek § 506(c) expenses from Fleet for the KERP, and whether the Debtor intended payments under the KERP to be payable as Chapter 7 administrative claims in the event the case is converted to a case under Chapter 7. Because the Debtor did not specifically mention the possibility of surcharging Fleet, or respond to Fleet's limited objection, the Court sustains Fleet's limited objection to the Amended Motion. With respect to the latter issue, this Court agrees with the rationale of the Court in *In re Geneva Steel Co.*, 236 B.R. 770 (Bankr.D.Utah 1999). In that case, the court rejected a severance plan that contemplated payments in the event the case was converted

to a case under Chapter 7. The court observed that "[s]uch a plan is unacceptable because of the adverse impact the provision could have on the administration of the case in Chapter 7.... [S]everance payments shall be treated as Chapter 11 administrative expense claims, and shall be paid by the Chapter 7 trustee as promptly as practicable on a pro rata basis with all other Chapter 11 administrative expense claims." 236 B.R. at 774.

## VI. CONCLUSION

In accordance with the foregoing, the Court shall enter an order approving the Debtor's Amended Motion for Authorization to Implement Employee Retention Program and to Reject Certain Executory Contracts, as modified on the record on October 23, 2001, and to specifically exclude a § 506(c) expense claims against Fleet, and to permit only a Chapter 11 administrative expense claim for any rights under the KERP. The Court overrules the Creditors' Committee Opposition to the Motion.