**In re GEORGETOWN STEEL COMPANY, LLC, Debtor.**

**No. C/A 03–13156–W.**

United States Bankruptcy Court, D. South Carolina.

Feb. 4, 2004.

**550**

Michael M. Beal, Columbia, SC, Robert S. Hawkins, Klett, Rooney, Lieber and Schorling, Philadelphia, PA, Robin C. Stanton, McNair Law Firm P.A., Columbia, SC, for Debtor.

Joseph F. Buzhardt, III, Mary G. Slocum, Office of the United States Trustee, Columbia, SC, for U.S. Trustee.

### ORDER

JOHN E. WAITES, Bankruptcy Judge.

THIS MATTER comes before the Court upon the Motion of Georgetown Steel Company, LLC (the "Debtor" or the "Company") for an Order Authorizing the Debtor to Implement a Key Employee Retention Program (the "Retention Motion") pursuant to 11 U.S.C. §§ 105(a) and 363(b) of the United States Bankruptcy Code[1] and opposition thereto. Having considered the record of the case and the arguments of counsel, the Court make the following findings of fact and conclusions of law.[2]

### FINDINGS OF FACT

1. On October 21, 2003, (the "Petition Date"), Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Debtor is operating its business and managing its properties as a debtor and debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

2. The Court has designated this case as a Complex Chapter 11 Case pursuant to Operating Order 01–02.

3. On October 29, 2003, the United States Trustee for the District of South Carolina appointed an Official Committee of Unsecured Creditors in Debtor's Chapter 11 case (the "Committee").

4. Debtor is a producer of high carbon steel billets and special grade wire rod used in the automotive, tire and construction industries. Shortly before filing, Debtor reduced its workforce from approximately 500 employees to 50 employees. Most of the terminated employees were hourly workers subject to a collective bargaining agreement with the United Steelworkers of America (the "Union"). On or about November 12, 2003, Debtor made a proposal to modify the CBA pursuant to §§ 1113 and 1114. As a result of negotiations, Debtor and the Union reached an

---

**1.** Further references to the United States Bankruptcy Code shall be by section number only.

**2.** The Court notes that to the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

agreement establishing and defining the rights and benefits applicable to employees, former employees and retirees who are or were employees of Debtor with respect to the CBA.

5. As of the date the Retention Motion was filed, Debtor had eliminated almost all of its remaining workforce, and identified fourteen (14) people as key managers and employees (the "Key Employees") that Debtor deems essential to either (a) the successful execution of a reorganization and restart of operations, or (b) assist the Debtor in liquidating its assets and maximizing values for the benefit of all constituents. In the Retention Motion, Debtor seeks authorization to implement a Key Employee Retention Program (the "Retention Plan") to encourage these employees to remain with the Debtor during the critical stages of the bankruptcy reorganization. The Retention Plan's two primary components are the "Retention Fee Program" and the "Success Fee Program."[3]

6. Debtor anticipates the total cost associated with the Key Employee Retention Plan, for both the Success Fee Program (excluding Mr. Roger Regelbrugge, explained hereinafter) and the Retention Fee Program will be approximately $620,000, together with a variable payment that cannot be determined at this time. This variable payment represents a further incentive bonus to be paid to Mr. David O. Shelley (the "CEO")[4] based upon increased distributions in certain amounts to prepetition unsecured creditors.

7. Debtor outlined the duties of the Key Employees in its Retention Motion. Debtor notes that each Key Employee has extensive experience with Debtor in their current positions and that the duties of the Key Employees are critical to the maximization of the value of the company assets and to the ongoing process of providing information to constituents, the Court and potential purchasers of the assets of Debtor. All of the Key Employees have been with the Company for a minimum of five

---

3. In its Motion, Debtor did not disclose the names of the Key Employees, their current positions and salaries, and the specific proposed "severance payments" or. success fees proposed in order to protect Debtor's business enterprise and the confidentiality of the Key Employees. Prior to the hearing on the Retention Motion, Debtor disclosed this information to CIT, MidCoast, the Official Committee of Unsecured Creditors (the "Committee"), which membership includes the Union, and the United States Trustee (the "UST"). Immediately prior to the hearing, Debtor requested that the Court place the record of the hearing under seal. The Union, the UST, several members of the media and certain former employees objected to Debtor's request. Debtor then agreed to place certain, more detailed information on the record not subject to seal with respect to its Retention Motion, and the Union withdrew its objection. Following argument, the Court granted Debtor's motion to seal the record on an interim basis and gave objecting parties an opportunity to object to the continued sealing of the record at a subsequent hearing. The only objection filed was by the UST. The Court's ruling with respect to the continued sealing of the record will be entered contemporaneously herewith and may be referred to hereinafter as the "Final Seal Order."

4. The Court notes that its disclosure of the name of the CEO, while continuing to not specify the names of the other Key Employees, is due to the fact that the CEO has been in the public eye and has served as the primary representative of Debtor to media and other parties. Furthermore, the CEO testified at the hearing on the Retention Motion and has testified at most public hearings relating to Debtor, and therefore it is fairly obvious that he is a Key Employee. The Court does not foresee prejudice to any party by such disclosure. In addition, the parties in interest have clearly recognized the CEO's importance by agreeing that he is to receive significant payments under the Retention Plan. Therefore it is unlikely that he will be hired away by a competitor.

years, and most have been with the Company significantly longer, with service in excess of 10, 20, or 30 years. Debtor further contends that the Key Employees are valued assets of the Company, with significant institutional knowledge that replacement employees (if available) would never acquire.

8. Among the specific duties to be performed, the Key Employees will be handling accounting reports, collecting accounts, performing claims reconciliations, selling finished products, selling raw materials, maintaining the computer system and the environmental controls systems, and overseeing the human resources needs for a corporation which formerly employed in excess of 500 employees. Debtor also attests to the importance of the Key Employees to both a sale of the assets or a reorganization by insuring that the availability of personnel necessary to the administration of the estate, including issues related to pensions, health benefits, asset sales, claims objections, labor issues, preparation of bankruptcy reports, collection of accounts, and marketing of the assets, to maximize the value of assets for the creditors.

9. Of the fourteen (14) employees, four employees are only projected to remain with the Company for a few months. The remaining ten employees are anticipated to remain with the Company through the earlier of confirmation of a plan of reorganization or the closing of the sale of substantially all the assets of the Company.

### A. The Retention Fee Program

10. The Retention Fee Program will consist of payments to Key Employees in order to provide them incentive to continue to work for the Company during the initial critical months of the bankruptcy case rather than to seek other longer term

employment with a competitor or elsewhere. In order to qualify for the Retention Fee Program, the employee must remain employed with the Company until the earlier of (a) the confirmation of a plan of reorganization; (b) the closing of a sale of substantially all of the assets of the Company; or (c) the employee's dismissal without cause, including as a result of the conversion or dismissal of the case, or the appointment of a Chapter 11 trustee (the "Qualification Date").

11. Each of the Key Employees shall have earned and be entitled to receive his or her designated Retention Fee on the Qualification Date. The Key Employees are to be paid their Retention Fee on the Qualification Date unless prior to that date the Key Employee is terminated for cause or voluntarily terminates his or her own employment.

12. The CEO's Retention Fee is further restricted in that it can only be paid 90 days after his termination without cause, provided that the CEO has not accepted employment with a buyer of substantially all of the assets of the Company within 90 days after his termination without cause (he may, however, be retained as a short term consultant by the buyer for a period not to exceed 90 days and qualify for this Retention Fee).

13. Debtor notes that monies due under the Retention Fee Program will be paid to the employees as reasonably soon after the Qualification Date as possible and will be deemed administrative expense claims of the bankruptcy estate pursuant to 11 U.S.C. § 503(b)(1)(A) and the applicable priority pursuant to 11 U.S.C. § 507(a)(i).

14. The total amount represented by Debtor to be paid to these fourteen (14) employees pursuant to the Retention Fee Program component is $319,766.00.[5]

---

5. In its Motion, Debtor described the Reten-   tion Plan as having two components: a Sever-

## B. Success Fee Program

15. An additional component of the Retention Motion is the "Success Fee." Debtor avers that the Success Fee is important to fully incentivize the reorganization or liquidation effort. As modified on the eve of the hearing, the Success Fee Program would formally apply to only the CEO and Regelbrugge. With respect to the CEO, a Success Fee is to be earned and irrevocably vested upon (a) the earlier to occur of (i) confirmation of a plan; (ii) the sale of substantially all of the assets of the Company; or (iii) termination of the CEO's employment without cause and provided that the CEO continues to be employed by the Company through the Qualification Date; and (b) but not due and payable until the allowed secured claims of CIT and MidCoast as set forth in the most recent Order Authorizing the Use of Cash Collateral entered by this Court have been paid in full or otherwise satisfied or waived by CIT or MidCoast.

16. Upon receipt of any Success Fee and Retention Fee to which the CEO is entitled hereunder, the CEO shall also be deemed to have released the Debtor from any claims related to any other pre-petition or post-petition employment contractual obligation

17. The monies due under the Success Fee Program will be paid as reasonably soon after the Qualification Date as possible and will be deemed administrative expense claims of the bankruptcy estate pursuant to 11 U.S.C. § 503(b)(1)(A) and the applicable priority pursuant to 11 U.S.C. § 507(a)(i).

18. The total amount represented by Debtor to be paid under the Success Fee Component to the CEO, contingent upon defined events representing a successful reorganization process, and not including the variable payment upon a certain increase in distribution to unsecured creditors as previously noted, is $300,000.

19. The Success Fee proposed to be paid to Regelbrugge relates directly to the sale of Debtor's manufacturing assets (the "Steel Mill").[6] Regelbrugge was previously employed by the former owner of Debtor and was a member of the Board of Directors. Prior to the filing of the bankruptcy petition, Debtor sought Regelbrugge's assistance in selling Debtor's assets or obtaining an equity infusion. Regelbrugge was employed prepetition by Debtor as follows:

   a. He would be paid $1,000 per day for days on which he worked at least 6 hours, and if he worked less then 6 hours he would be compensated at the rate of $125 per hour.[7]

ance Program and a Success Fee Program. Apparently on the eve of the hearing on the Retention Motion, Debtor and the Committee agreed to refashion the Retention Plan into two different components: (1) a Retention Fee Program which represents both the severance fee payments to be made to all of the employees and success fee payments contemplated to be made to nine (9) of the Key Employees; and (2) a Success Fee Program which would thereafter only apply to the CEO and Regelbrugge. According to Debtor and the Committee this change was to simplify the Retention Plan and to make it more incentive based.

6. Shortly after filing its bankruptcy petition, Debtor filed an application to retain Regelbrugge as a consultant. Following objections by the UST and the Committee with respect to Regelbrugge's arguable "insider" status, the Committee suggested he remain employed by Debtor under the same pre-petition terms, but seek approval of a success fee in its Retention Motion. Regelbrugge has since resigned from Debtor's Board of Directors. Neither the UST nor any other party expressed any objections to the terms of the Retention Plan as to Regelbrugge.

7. The Court notes that certain investment bankers have now been employed by Debtor to facilitate the sale of assets. The efforts by

b. He would be paid a success fee of 1% of the gross sales price on a "going concern" transaction which would provide for the restart of Debtor's operations; and

c. He would be reimbursed for his reasonable expenses.

Debtor is seeking approval of a success fee for Regelbrugge in its Retention Motion in the amount of .75% of the gross cash consideration paid to Debtor upon closing of a sale of the Steel Mill as outlined in the Retention Motion. In the event Regelbrugge is entitled to a Success Fee due to a sale of the Steel Mill for a price in excess of $10,000,000, Debtor shall be entitled to a credit of a portion of the compensation paid to Regelbrugge postpetition for any portion of his Success Fee owed in excess of that amount.

20. At the hearing on the Retention Motion, testimony was provided in support of Debtor's Motion. The CEO testified that the Debtor's Board of Directors (the "Board"), which did *not* include any of the Key Employees, deemed it important to devise a plan in order to retain certain essential employees in order to maximize value to the estate.[8] He further testified that the Retention Plan would assist in encouraging the Key Employees to concentrate on their job duties rather than seeking new employment, and that the Key Employees were selected due to their specialized skills.

21. The evidence submitted provided the names of the Key Employees as well as the extent of their specialized experience and their contribution to Debtor. Detailed information regarding each Key Employee's duties was also provided.

22. The CEO described the deliberations of the Board of Directors with respect to the Retention Motion as well as the processes utilized to arrive at the final amount of the Retention Plan. The final Retention Plan proposed by Debtor at the hearing was the result of a negotiated settlement with the Committee that reduced the overall payout to the CEO and became more incentive based. It appears that the Company's Board of Directors (the "Board") had previously approved a Retention Fee for the CEO with a higher amount of payment, but at the request of the Committee and with the hope of composing a Retention Plan in the interest of insuring approval of the plan for all the other employees, the CEO voluntarily agreed to the amounts and terms proposed by the Committee.

23. The CEO also testified that the Board was concerned about the ramifications of full disclosure of all respects of the Retention Plan including retaliation against or harm to the Key Employees, a disruption with respect to any proposed sale, and information that can be gleaned from the Retention Plan by competitors that would enable them to "hire away" any Key Employee.

24. Since the filing and due in large part to the efforts of the Key Employees, through collection of accounts and sale of inventory and finished product, Debtor has already paid down a significant amount owed on its largest secured claim, that of CIT.

25. Objections to the Retention Plan were filed by certain former employees of Debtor and by the Union. Essentially, the

---

the investment bankers may include to some extent working with contacts originated by Regelbrugge. In such event, it is contemplated that Regelbrugge's efforts will be curtailed to avoid duplication of expenses to the estate.

8. At the time of the hearing, Mr. Shelley was the CFO and effective January 1, 2004, he became the President and CEO of Debtor.

former employees objected to their failure to receive severance payments in light of the proposal as set forth in the Motion to pay severance to the Key Employees. The Union's primary argument in its pleadings centered around Debtor's failure to disclose detailed information in its Retention Motion concerning its proposed use of assets.[9] The Union also argued that Debtor failed to show the need for the Retention Plan or that the benefits to be provided outweigh the treatment to Debtor's former employees. The Union further argued that the Retention Plan is improper, among other reasons, for an entity that has been permanently shutdown.

26. The Committee supports the Retention Plan, noting that much negotiation occurred to arrive at what the Committee believes now to be a reasonable proposal and that the continuing operation of the Key Employees was essential in order to potentially sell the Steel Plant at the maximum going concern value. Debtor's secured creditors, CIT and MidCoast, and the UST also support the Retention Plan.

## CONCLUSIONS OF LAW

Debtor moves for approval of its Retention Plan pursuant to §§ 363 and 105 of the Bankruptcy Code. Section 363(b) of the Bankruptcy Code permits a debtor to use property of the estate "other than in the ordinary course of business," after notice and a hearing. § 363(b)(1). Additionally, § 105(a) allows this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Courts often review a debtor's use, sale or lease of property of the estate outside of the ordinary course of business pursuant to the debtor's demonstration of a sound business purpose. *See, e.g., In re*

*Advanced Med. Products, Inc.,* C/A No. 99–02548, slip op. (Bankr.D.S.C. May 10, 1999) (delineating elements of sound business purpose test for approval of a pre-confirmation sale); *In re Taylor,* 198 B.R. 142, 157 (Bankr.D.S.C.1996) (same). The factors considered under this test generally represent the "business judgment test." *See Dai–Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward),* 242 B.R. 147, 153 (D.Del. 1999) ("In evaluating whether a sound business purpose justifies the use, sale or lease of property under Section 363(b), courts consider a variety of factors, which essentially represent a 'business judgment test.' ").

It has been recognized that courts should approve the exercise of a debtor's business judgment unless it is " 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.' " *In re Aerovox, Inc.,* 269 B.R. 74, 80 (Bankr.D.Mass.2001) (citing *In re Logical Software,* 66 B.R. 683, 686 (Bankr.D.Mass. 1986)). Other courts favor an arguably more liberal interpretation of § 363(b), noting that a bankruptcy judge in examining a § 363(b) motion should have " 'substantial freedom to tailor his orders to meet differing circumstances.' " *Montgomery Ward,* 242 B.R. at 154–55 (citing *Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)* 722 F.2d 1063, 1069 (2d Cir.1983)). In keeping with such approach, retention plans are reviewed on a case-by-case basis, depending on each debtor's particular facts and circumstances. *Montgomery Ward,* 242 B.R. at 154. Where a debtor has shown that certain employees are essential, courts often authorize implementation of retention plans. *See In re America West Airlines,*

---

**9.** As previously noted, the Union withdrew its objection to Debtor's motion to place certain information under seal after negotiations at the hearing.

*Inc.,* 171 B.R. 674, 678 (Bankr.D.Ariz.1994) (approving success bonuses to certain officers and employees as within debtor's sound business judgment); *In re Interco, Inc.,* 128 B.R. 229, 234 (Bankr.E.D.Mo. 1991) (authorizing debtor to assume prepetition severance contracts and approving performance based retention plan to ensure critical employees remained with the debtor).

In addition to considering whether a debtor's proposed retention plan is a proper exercise of debtor's sound business judgment, some courts have further examined whether the plan is fair and reasonable. *See, e.g., Aerovox,* 269 B.R. at 80; *America West,* 171 B.R. at 678; *In re Interco, Inc.,* 128 B.R. 229, 234 (Bankr. E.D.Mo.1991).

The debtor has the burden of establishing its exercise of sound business judgment and that its proposal is fair and reasonable. Objectants are charged with rebutting such evidence. *Aerovox, Inc.,* 269 B.R. at 81–82. *See also Montgomery Ward,* 242 B.R. at 155.

▇▇▇ This Court favors a balanced approach that does not grant debtors unfettered discretion, but permits the Court to analyze factors, based on the facts and circumstances of each case, that guide the Court in assessing a debtor's proposed retention plan. *See Montgomery Ward,* 242 B.R. at 154–55. As such, in the matter before the Court, the Court will examine whether Debtor's proposed Retention Plan is an exercise of Debtor's sound business judgment and is fair and reasonable, considering the facts and circumstances of Debtor as well as the Court's ability, if necessary, to tailor the Retention Plan to accomplish necessary goals.

Retention plans are usually proposed by debtors to encourage certain crucial employees to remain with the company through a critical, transitional time period

when the exact future of the company is unclear and when those employees would be most likely to search for other employment. Debtor presented testimony and other evidence to establish the use of its sound business judgment in proposing the Retention Plan.

In this case, the approval of the Retention Plan is supported by the principal secured creditors, CIT and MidCoast, which claimed an indebtedness of approximately $33,000,000 at the beginning of the case. Approval of the Retention Plan is also supported by the Committee, which represents approximately $20,000,000 in prepetition debt, and the UST, an independent "watchdog" for bankruptcy cases, working within the United States Department of Justice.

The Retention Plan is opposed by certain former employees, both Union and non-Union, who believe that they should equally share in any monies available for severance-like benefits, particularly in light of the sudden termination of their employment immediately before the filing of the bankruptcy case. This group of employees expressed their objections in statements to the Court at the hearing but offered no evidence that their services would be presently as essential to the non-operating Debtor or its reorganization at this stage.

The Retention Plan is also opposed by the Union upon several grounds. The Union's objection following testimony centered around its argument that Debtor failed to establish that the Key Employees had real prospects of other employment and that the Retention Plan was thus not necessary. The Union further argued that there was no evidence presented that the Board relied on any empirical proof concerning the potential that the Key Employees will leave. The Union also con-

tended that the Retention Plan is neither fair nor reasonable in that there has been much hardship imposed upon the retirees and the Union employees that have been terminated, including the elimination of severance and the cessation of certain benefits. Further, the Union argues that it is improper to approve a Retention Plan where Debtor is in a liquidation mode, and that the Success Fee proposed to be paid to Regelbrugge for his marketing efforts overlap with other services being provided to Debtor.

## DISCUSSION

■ Initially, it appears that there is no real dispute that the Key Employees are critical to Debtor's attempt to reorganize, to maximize value in any potential liquidation, and to benefit the estate overall. There are also a multitude of administrative and reporting duties that must be performed in connection with a large bankruptcy case in addition to the more substantive efforts to collect accounts and preserve business assets. Furthermore, the Union voiced no objection to the various amounts to be paid under the Retention Plan or to the structure of the Retention Plan or timing and criteria for payments.

The Court notes that the Union presented no evidence to rebut Debtor's evidence that the proposed Retention Plan is an exercise of its sound business judgment and is fair and reasonable.[10] The evidence established the clear need for each Key Employee and that substantial negotia-

tions had been undertaken with the Committee to reduce benefits and arrive at a final, more incentive based, plan. Additionally, the final proposal includes a waiver of claims by the CEO upon payment related to any employment contractual obligation, thus reducing Debtor's potential risk of liability to the estate. Finally, the efforts of the Key Employees have already substantially reduced the indebtedness owed to Debtor's primary secured creditor, CIT, from approximately $28 million to $6 million as of January 13, 2004.

Debtor also presented evidence that many of the Key Employees have either received other offers or are highly marketable to other companies. Inasmuch as it was clear from the testimony that each Key Employee performed a function necessary to Debtor at this crucial stage, it is natural for Debtor and its Board to be concerned about even the slightest risk of turnover at this critical time. Testimony established that it was Debtor's business judgment that any one of the Key Employee's departure could potentially damage Debtor's reorganization or sale efforts, a contention that was further bolstered by the final support of the Committee, the secured creditors, and even the UST.

■ The Court further notes that there is no prohibition on a retention plan assisting in a potential liquidation of an entity. *See Montgomery Ward*, 242 B.R. at 154 (citing cases and concluding that there is no requirement upon a debtor "to demonstrate a reasonable probability of success-

---

10. The Union does not concede that the standard applicable to similar retention motions is the business judgment rule. Instead, the Union contends the Retention Plan should be reviewed with "rigorous scrutiny." However, the Union cited no supportive persuasive authority, citing only a 1939 United States Supreme Court opinion regarding dealings of fiduciaries, such as officers and directors, with respect to their claims in a bankruptcy

case. *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). The case does not address retention plans and is inapposite, particularly considering the broad array of recent, on-point case law applying the business judgment standard. The Union did not cite a single opinion addressing the consideration of a proposed employee retention plan under any other standard than the § 363 business judgment standard.

ful reorganization."); *Aerovox*, 269 B.R. at 81–82 (key employees' continued employment is important to maximization of offer for debtor as a going concern). Finally, while the position of the Union is certainly important, the Union and Debtor have already voluntarily reached a comprehensive agreement concerning treatment of the Union's former employees and retirees. Thus, the Union's argument that there should be direct consultation with the Union in developing an appropriate retention plan is weakened. *See In re Geneva Steel Co.*, 236 B.R. 770, 773 (Bankr.D.Utah 1999) (proposal of retention plan without first discussing provisions with union is not example of sound business judgment where union employees may be necessary to a successful reorganization).

The proposed payments under the Retention Plan representing slightly more than approximately 1% of the indebtedness as of the Debtor's filing appears to be fair and reasonable under the circumstances of this case and under certain conditions set forth herein. Debtor has proposed Retention Fees with respect to all remaining employees, including support staff and not just its high-level executives. A portion of the Retention Fees to be paid to twelve of the fourteen Key Employees represent a term of only one to three months relative to their regular salaries. The Success Fee Program and to some extent the Retention Fees are primarily incentive based and are tied to certain accomplishments relating to distribution to creditors, including former employees, both Union and non-Union, or indicators of case progress such as plan confirmation, and/or a sale of substantially all of Debtor's assets. The Success Fee attributable to Regelbrugge is only to be paid to the extent the sale of assets is attributable to a limited list of contacts made by him and therefore not initiated by another entity. Finally, the total amounts to be paid to the Key Employees are with-

in what the Court would consider the realm of reasonableness for a business addressing the magnitude of creditor claims represented in this case, approximately $53,000,000, particularly considering that the fees and costs of professionals serving in the case, such as attorneys, financial consultants, and investment bankers, will likely approach or exceed $1,000,000 in total. The Court notes that a significant portion of the proposed payments, in addition to the previously noted variable payment, is to be paid to the CEO but is conditioned upon what Debtor and the Committee have determined are criteria for a successful reorganization. It appears undisputed that the primary creditors of the estate believe that the CEO is the driving and essential force behind the efforts to maximize values, including a potential sale of the Steel Mill which would likely provide employment to laid-off employees, both Union and non-Union. In addition, the CEO's former role as Executive Vice–President for Finance/CFO and role of President/CEO have been consolidated into one position. As such, the CEO's job responsibilities have increased. The evidence indicated that the consolidation of these jobs saves Debtor in excess of $225,000.00 per year plus benefits.

The Court recognizes the objections of the former employees, as expressed individually and by the Union, and is mindful of their contributions to Debtor and the unfortunate hardship they have faced. Nevertheless, not all employees and former employees of Debtor are similarly situated in terms of their importance to the reorganization process, and the Court finds that Debtor has demonstrated proper business judgment in deeming the few remaining employees with specialized skills or experience key to the reorganization or sale efforts. The Court further notes that the goals sought by the continued reten-

tion of the Key Employees are grounded in achieving the maximum benefit for all constituencies, not just those remaining employees. Additionally, to respond to the public's interest in the Company the Court has, in conjunction with the information Debtor has already made public, provided detailed pertinent information with respect to Debtor's Retention Plan herein except with respect to certain limited, specific information that all parties agreed is necessary to remain under seal as set forth in the Final Seal Order entered contemporaneously herewith. Accordingly, the Court will approve Debtor's Retention Plan, under the conditions of this Order, in the total amount not to exceed $619,766.00, as well as the Success Fee attributable to Regelbrugge upon the conditions stated herein. The Court additionally approves the variable payment to the CEO, which is contingent upon a schedule of increased distributions to benefit the unsecured creditors of the estate.

The approval of the Retention Plan is subject to the conditions that if the Key Employee's actions cause or materially contribute to a determination by the Court to convert or dismiss the case or appoint a Chapter 11 Trustee, in such event the Key Employee shall not be entitled to payment under the Retention Plan absent further order. In addition, in determining whether "dismissal without cause" is an event triggering payments, Debtor shall consider "cause" to include, but may not be limited to, the failure to perform duties as directed by management or the Board of Directors and the failure to abide by known requirements of the Bankruptcy Code, Bankruptcy Rules, and Local Rules and Orders of this Court or to perform in a manner consistent with the goals of Debtor's reorganization. Finally, the dismissal, with or without cause, or voluntary separation of any Key Employee specified in the exhibits at the hearing shall be reported under seal to the Court, the UST and the Committee within ten (10) days of such dismissal or separation.

**AND IT IS SO ORDERED.**

## JUDGMENT

Based upon the Findings of Fact and Conclusions of Law as recited in the attached Order of the Court, Debtor's Motion for an Order Authorizing the Debtor to Implement a Key Employee Retention Program is granted to the extent provided by the attached Order.