**In the Matter of ALLIED HOLDINGS, INC. and Related Debtors, Debtors.**

**Nos. 05–12515–WHD to 05–12537–WHD.**

United States Bankruptcy Court,
N.D. Georgia,
Newnan Division.

Dec. 19, 2005.

Jeffrey W. Kelley, Harris Winsberg, Troutman Sanders LLP, Atlanta, GA, for Debtors.

Jonathan Alter, Bingham McCutchen LLP, Hartford, CT, Richard B. Herzog, Nelson Mullins Riley & Scarborough, Atlanta, GA, for Committee.

Frederick Perillo, Previant Goldberg, Milwaukee, WI, for International Brotherhood of Teamsters.

## ORDER

W. HOMER DRAKE, JR., Bankruptcy Judge.

Before the Court is the Debtors' Motion for Approval of a Key Employee Retention Program. The Official Committee of Unsecured Creditors, as well the Debtors' post-petition lenders, support the Debtors' Motion, while the Teamsters National Automobile Transportation Industry Negotiating Committee (hereinafter the "Teamsters Committee") and the Office of the United States Trustee oppose the Motion. This matter constitutes a core proceeding, over which this Court has subject matter jurisdiction. *See* 28 U.S.C. § 157(b)(2)(A); (M); § 1334.

### BACKGROUND

The Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code on July 30, 2005. The Debtors are most likely the largest provider of car haul and delivery services in the United States and have approximately 6,400 employees, approximately 500 of whom are non-bargaining employees. On September 27, 2005, the Debtor's filed the instant motion, seeking authority to implement a Key Employee Retention Program (hereinafter the "KERP").

The Debtors have proposed a program of compensation designed to ensure that approximately 80 non-bargaining employees do not leave the company. The Debtors assert that these employees are particularly necessary to the Debtors' ongoing operations and successful reorganization.[1]

---

1. The Debtors have provided a list of the key employees to the Committee, upon which the Teamsters Committee's representative sits, the Debtors' post-petition lenders, and the United States Trustee, pursuant to confidentiality agreements, but have not filed the list. Although the list was not entered into evidence, it was provided to the Court during the course of the hearing. The Teamsters Committee objects to the omission of the list from the public record. After considering the testimony of Brenda Ragsdale, the Debtors' Vice President of Human Resources, and the arguments of the Teamsters Committee, the Court finds that the exhibit should be filed under seal. *See In re Georgetown Steel, LLC*, 306 B.R. 542 (Bankr.D.S.C.2004) (specific information regarding debtor's key employees and

Under the KERP, the Debtors would provide three types of benefits to four different tiers of employees. The benefits provided by the KERP would be in lieu of any benefits to which the employees were previously entitled.

First, the KERP provides for eligible employees to receive lump-sum severance payments, the amount of which depends upon the position held. These payments would be payable no later than 30 days after a termination. An employee would not be eligible to receive severance payments if the employee: (1) voluntarily resigned without good reason; (2) was fired for cause; (3) retired, died, or was permanently disabled; (4) failed to return from a leave of absence; or (5) received a job offer from a purchaser of substantially all of the Debtors' assets, providing the employment offered is on substantially the same terms and conditions, regardless of whether the employee accepts the offer or retains the employment. Under the KERP, an employee would be considered to have resigned with good reason if: (1) his or her salary was reduced, unless the salary reduction applies generally to all employees with similar job responsibilities and duties;[2] (2) he or she suffered a material reduction in benefits or perks, unless the reduction applies generally to substantially all other eligible employees; (3) his

or her stay bonus was reduced; (4) the Debtors materially diminished the scope of his or her responsibilities and duties (other than a reduction in scope of duties resulting from the Debtors becoming smaller as the result of a divestiture of a division or subsidiary), or the Debtors assign the employee any duties that are materially inconsistent with his/her current position or current duties and responsibilities; (5) the Debtors failed to pay the employee; or (6) the Debtors relocated the employee by more than 50 miles without the employee's express written consent. The severance payments range from between 25% of annual base salary[3] to 150% of annual base salary, depending upon the tier.

Second, the KERP provides a retention/emergence bonus that would equal a percentage of the employee's annual base salary as follows: (1) Tier 1: 75% to 90%;[4] (2) Tier 2: 59.4% to 85%; (3) Tier 3: 35% to 50%; and (4) Tier 4: 20% to 25%. The bonuses are earned and payable in four installments as follows: (1) for Tiers 1 and 2, the first installment would equal 15% of the total bonus, payable if the employee remains with the Debtors through the date upon which the Debtors deliver to the Committee a restructuring strategy ("Milestone 1"), and for Tiers 3 and 4, the first installment would equal 25% of the

amounts proposed for retention payments constituted commercial information within the meaning of section 107(b) and could, therefore, be filed under seal). A notice shall be provided to all creditors that the list has been filed. Any party in interest may file a request to view the list, which the Court will consider.

2. The KERP originally provided that an employee who voluntarily resigned due to a salary reduction would be eligible for severance, regardless of whether all similarly situated employees were affected by the reduction. Following the hearing of this matter, the Debtors modified the plan to provide that the

salary reduction would only be considered good cause for a voluntary termination if the employee were singled out for the salary reduction.

3. "Annual base salary" is a defined term that includes all regular cash compensation, including any regular cash compensation that is contributed to a retirement account pursuant to a salary deferral or reduction agreement.

4. The KERP, as originally proposed, provided for Tier 1 stay bonuses of between 85% and 96.4%. The Tier 1 employees voluntarily agreed to reduce the percentages to between 75% and 90%.

total bonus, payable if the employee remains with the Debtors through Milestone 1 or December 31, 2005, whichever is earlier; (2) for Tiers 1 and 2, the second installment would equal 20% of the total bonus, payable if the employee remains with the Debtors through the filing of a plan ("Milestone 2"), and for Tiers 3 and 4, the second installment would equal 25% of the total bonus, payable if the employee remains with the Debtors through Milestone 2 or March 31, 2006, whichever is earlier; (3) for Tiers 1 and 2, the third installment would equal 30% of the total bonus, payable if the employee remains through the effective date of the confirmed plan, and for Tiers 3 and 4, the third installment would equal 25% of the total bonus, payable if the employee remains through the effective date of the plan; and (4) for Tiers 1 and 2, the fourth installment would be 35% of the total bonus, payable if the employee remains for 60 days after the effective date of the plan, and for Tiers 3 and 4, the fourth installment would be 25% of the total bonus, payable if the employee remains for 60 days after the effective date of the plan.[5]

The exception to the above would be the bonus for the Debtors' President/CEO, who has voluntarily agreed to wait to receive his stay bonus until the Debtors have achieved the last milestone. Accordingly, the Debtors' President/CEO would receive a stay bonus only if he remains employed by the Debtors for 60 days after the effective date of a confirmed plan.

The Debtors would also have a fund of $150,000 from which discretionary bonuses, not to exceed $30,000 per employee, could be given to employees who are not otherwise entitled to receive a bonus. These bonuses would be given based upon the employee's contributions to the Debtors' reorganization.

### FINDINGS OF FACT

1. The Debtors have been in financial distress since 2002. Since 2001, the Debtors have been attempting to turn the business around. As part of this effort, the Debtors have reduced non-bargaining staffing levels by almost 50% through outsourcing and job elimination.

2. If the KERP is approved, approximately one half of the Debtors' managers, directors, and executives would participate in the KERP. The KERP participants represent 1.3% of the Debtors' total work force.

3. In creating the proposed KERP, the Debtors employed the assistance of an outside human resources consulting firm, Mercer Human Resource Consulting. In evaluating which employees were likely to resign, Mercer considered the Debtors' culture, mood, and situation and personally consulted with the Debtors' Board of Directors and management, including the CEO and the VP of Human Resources. Mercer did not conduct one-on-one interviews with each of the individual employees listed in the proposed KERP and did not investigate what types of jobs might be available to the employees if they were to resign.

4. The design of the proposed KERP was overseen by the Debtors' Compensation Committee, which consisted of four independent members of the Debtors' Board of Directors, Leland Strange, Robert Woodson, William Benton, and David Bannister.

---

5. The KERP originally provided that all tiers would receive the bonus in four equal installments. Following the hearing on this matter, the Debtors amended the KERP to provide for Tiers 1 and 2 to receive a lower percentage in the first two installments and a higher percentage in the second two installments.

5. The initial decision as to which employees would be included in Tiers 3 and 4 was made by the senior management members who supervise those employees on a daily basis. The senior management staff was asked to select the employees: (1) who are absolutely critical to operations and the reorganization; (2) who possessed unique skills and abilities; (3) who are at risk of leaving; (4) who would be difficult to replace; and (5) whose work load has become unbelievably heavy because of the bankruptcy filing.

6. The President/CEO decided which employees would be included in Tier 2. The Compensation Committee chose the employees to be included in Tier 1.

7. Mercer recommended the various amounts of the benefit payments, and the Debtors' management negotiated the final amounts with the Committee. After an investigation by its financial advisor, the Committee decided to support the KERP. The Committee believes that the KERP is necessary and should be approved. The Debtors' post-petition lenders also support the KERP.

8. The KERP was approved by the Compensation Committee.

9. If every covered employee became entitled to receive severance payments, the cost to the Debtors would be approximately $5,622,975.

10. Assuming all covered employees remain employed by the Debtors through all four milestones, the total cost to the Debtors for the bonus portion of the KERP would not exceed $4,455,301.

11. Assuming all covered employees received their full bonuses and were eligible for severance payments, the total cost to the Debtors for the KERP would equal .5% of the Debtors' revenues.

12. The Debtors have experienced an increase in voluntary turnover since the filing of the bankruptcy case. At the time of the first hearing on the KERP on October 11, 2005, two of the Debtors' Tier 4 employees had already resigned, and a third employee had submitted a resignation. By the time of the continued hearing on October 24, 2005, a third Tier 4 employee had resigned.

13. In order to cut costs, the Debtors have also frozen salaries and reduced benefits offered to non-bargaining employees and have required non-bargaining employees to take unpaid furloughs. Specifically, from 2001 through 2005, the Debtors' non-bargaining employees have received no annual merit raises. The Debtors have also eliminated matching contributions to non-bargaining employees' retirement account and have frozen the defined-benefit pension plan for non-bargaining employees. The non-bargaining employees are now being asked to contribute approximately 30% for their health care insurance and 100% for their dental and vision insurance, and the Debtors have switched to an insurance plan that requires higher deductibles.

14. The compensation paid to the Debtors' CEO in 2004, taking into consideration the payment of bonuses, was approximately 108% of the average compensation paid to management for other companies in the trucking sector. The other Tier 1 employees also received compensation in 2002 through 2004 that exceeded the average compensation paid to management of ABF Freight Systems, a publicly traded, unionized trucking company that has more employees and generates higher revenues that the Debtors.

CONCLUSIONS OF LAW

Section 363(b) of the Bankruptcy Code provides that a "trustee [or debtor-in-possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the

estate." 11 U.S.C. § 363(b). KERP programs such as the one the Debtors seek approval to implement have become customary uses of estate funds in large business reorganizations. *See In re Aerovox, Inc.,* 269 B.R. 74, 80 (2001).

## A. *Standard of Review*

■ The parties' first disagreement is over the proper standard of review for such an expenditure of estate funds. The Debtors assert that the proper standard of review is the "business judgment" standard. There is wide support for this proposition in many decisions addressing KERPs. In *In re Aerovox, Inc.,* the bankruptcy court stated that approval of such an expenditure should be granted if the bankruptcy court is persuaded that the debtor has used "proper business judgment" in formulating and proposing the plan and that the plan itself is "fair and reasonable." *See In re Aerovox, Inc.,* 269 B.R. 74, 80 (2001) (citing *In re Interco Inc.,* 128 B.R. 229, 234 (Bankr.E.D.Mo. 1991)); *see also U.S. Airways, Inc.,* 329 B.R. 793, 797 (Bankr.E.D.Va.2005) (KERP should be approved if "the debtor has used 'proper business judgment' in adopting the plan, and the plan is 'fair and reasonable' "); *In re Montgomery Ward Holding Corp.,* 242 B.R. 147, 153 (D.Del.1999) (in considering whether to authorize use of estate assets to fund a KERP, courts require the debtor to show a "sound business purpose" for the KERP and consider a "variety of factors, which essentially represent a 'business judgment test' ").

The Teamsters Committee argues that the appropriate standard of review here is not the "business judgment" standard, but rather the "rigorous scrutiny" standard reserved for transactions between insiders and the corporation. The Teamsters Committee cites the case of *In re Regensteiner Printing Co.,* 122 B.R. 323 (N.D.Ill.1990).

In *Regensteiner,* the district court reversed the bankruptcy court's approval of post-petition employment contracts for the debtor's "key managerial and executive personnel" on the basis that the debtor failed to present any evidence that the plan was necessary for the preservation of the estate. In the course of its opinion, the court noted that the contracts were transactions between insiders and the debtor corporation and, therefore, deserved rigorous scrutiny. *See Regensteiner,* 122 B.R. at 326 (N.D.Ill.1990) (citing *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939)). To that end, the court stated that, especially in cases in which there is no independent trustee, the court must require the insiders to prove that the transaction is fair to the bankruptcy estate. *See id.* Finding that the employees had failed to present evidence as to whether the employees would continue working without the contracts or whether the debtor could replace the employees for a lesser cost, the court concluded that the employees had failed to meet their burden. *See id.* The court specifically rejected the employee's argument that the debtor's decision to award the contracts was entitled to the deferential standard of the business judgment rule, noting that " 'business judgment is not a statutory ground for allowance of administrative expenses incurred out of the ordinary course of business.' " *See id.* (citing *In re Club Dev. & Mgmt.,* 27 B.R. 610, 612 (9th Cir. BAP 1982)).

Having carefully considered the various opinions and the parties' briefs, the Court will follow the majority of courts that have addressed this particular issue. *See In re Pacific Gas & Elec. Co.,* 2001 WL 34133840, *2 (Bankr.N.D.Cal.2001) (rejecting the argument that the court must second guess the debtor's selection of which employees would be eligible for a KERP and noting that reviewing "each individual

employee's likelihood of leaving absent a retention bonus that is some percentage greater or less" than what an outside consultant has proposed is "uncalled for under the *Club Development* and *Regensteiner* cases and would be impracticable"); *see also In re Georgetown Steel, LLC,* 306 B.R. 549, 557 n. 10 (Bankr.D.S.C.2004) (rejecting the union's argument that the rigorous scrutiny standard of review is required). Under the majority view, the proponent of the KERP must show that a sound business purpose exists for the plan and that the plan itself is fair and reasonable. This approach avoids the possibility that the debtor will have unfettered discretion in devising a plan and also permits the Court to "analyze factors, based on the facts and circumstances of each case," and "to tailor the Retention Plan to accomplish necessary goals." *In re Georgetown Steel,* 306 B.R. at 556.

### B. *Application of the Standard of Review to the Proposed KERP*

■ In this case, because the Debtors have established that the process by which they created and adopted the KERP was reasonable and that implementation of a KERP is necessary, the Court finds that the Debtors have a sound business purpose for proposing and implementing the KERP. First, as to the process itself, the Debtors have shown that they took reasonable steps in making the decision to implement a KERP and in structuring the program. The Debtors sought the advice of an outside consultant[6] and sought the Committee's participation in the formulation of the KERP. The creation of the KERP was overseen by the Compensation Committee, which was comprised of outside directors. The Compensation Committee approved the

KERP, and the Debtors have obtained the support of the Committee and the Debtors' post-petition lenders.

Second, the Debtors have presented sufficient evidence to support a finding that the use of estate property to fund the KERP serves the sound business purpose of retaining the Debtors' key employees. The testimony presented established that the KERP is necessary to achieve this goal because the designated employees are critical to the Debtors' ongoing operations and reorganization efforts and are at risk of resigning.

Brenda Ragsdale, the Debtors' Vice President of Human Resources, testified that, as a group, the employees selected for participation in the KERP are critical to the Debtors' operations and reorganization. Leland Strange also testified that the Tier 1 employees are very effective and are critical to the Debtors' success. In part, the Debtors' concern over losing any of the key employees comes from the significant reductions in non-bargaining staffing levels that were implemented throughout the previous four-year period as part of the Debtors' turn-around process. The number of non-bargaining employee positions was reduced by 50% during that time period, although some of these positions appear to have been outsourced. Ragsdale's testimony, which was also supported by the testimony of John Dempsey from Mercer, indicates that the Debtors have no "bench strength" upon which to call in the event one of these key employees resigns. Rather than moving an employee to cover a departing employee's function, the Debtors must either hire from the outside or require the remaining employees to take on even more job duties. Hiring employees from the outside not only impacts the Debtors' productivity, but

---

**6.** The Teamsters Committee has questioned the methods employed by the outside consul- tant. However, the Court cannot find that the methods chosen were unreasonable.

also costs the Debtors in time and money to recruit (executive search firm fees and relocation expenses) and to train new employees.

The Debtors cannot operate without a certain number of executives, senior managers, and managers. As Ragsdale testified, these individual employees have job skills, experience, and information that are critical to daily operations and, in some cases, to the Debtors' ability to address specific challenges that must be met before the Debtors can emerge from bankruptcy. It is to be expected that, at higher levels of management, the loss of those skills and the inability to access that information will seriously impact both operations and the reorganization. Further, the voluntary departure of executives and senior management will send a message that the Debtors' hopes of reorganizing are doomed, which could lead to further losses of lower-level employees who are not privy to the same information as the senior management.

The Debtors identified the specific Tier 3 and 4 key employees by asking the directors and managers who supervise these employees to select those employees who were absolutely critical to operations and the reorganization, possessed unique skills and abilities, were at risk of leaving, would be difficult to replace, and had been asked to perform an unbelievably heavy work load since the bankruptcy filing. These factors were reasonably calculated to identify those employees that the Debtors cannot do without. The Court considers the opinions of those supervisors to be the best evidence that retaining these particular employees is necessary.

Ragsdale's testimony also supports a finding that there is a risk that these employees will resign. Ragsdale testified that voluntary turn over during the two months since the commencement of the Debtors' case has increased over the two months immediately prior to the commencement of the case. She also testified that the voluntary turn over was most dramatic in the grade levels affected by the KERP. In fact, since the filing of the KERP motion, three of the designated key employees have actually resigned.

Further, the testimony presented paints a picture of a work environment that is not conducive to maintaining employee loyalty. For example, from 2001 through 2005, these employees received no annual merit raises. They were also required to take unpaid furloughs. Their benefits were reduced when the Debtors eliminated the matching of employee contributions to 401(k) accounts, froze the defined-benefit pension plan, and began requiring employees to pay approximately 30% of the premiums for their health-care insurance and 100% of the premiums for their dental and vision insurance. At the same time, these employees suffered a reduction in the insurance benefits received because the Debtors switched to insurance plans with higher deductibles. Many of the employees have also been asked to take on additional job duties. In effect, the Debtors have consistently asked the employees to do more for the same amount of pay and less benefits.

The Court recognizes the Teamsters Committee's point that, although these conditions have existed for some time, the Debtors were able to retain these employees prior to the filing of the bankruptcy case. However, a bankruptcy filing is naturally an event that signals to employees that the debtor is in considerable financial distress and results in new concerns, uncertainties, and stress for the employees. These employees have no guarantees that the Debtors will emerge from bankruptcy and will not instead be liquidated. They also have no promises that, if they stay

with the Debtors and the worst occurs, they will be provided with some compensation to help them transition into new jobs. Ragsdale testified that the employees are receiving an increased number of calls from search firms and that the recruitment efforts have become more aggressive since the filing of the bankruptcy case. Presumably these other companies at least appear to offer more stability to these employees than a company in bankruptcy. Ragsdale's testimony, especially as to her own consideration of taking another position, supports the obvious conclusion that employees are more likely to consider new career opportunities at this time.

The Court is also not persuaded by the Teamsters Committee's argument that the Debtors' employees have no place to go. While it is true that the Debtors make up the bulk of the car-haul industry and it stands to reason that the Debtors' competitors could not absorb all of the Debtors' key employees, Ragsdale and Dempsey both testified that the key employees would not be limited to obtaining new positions in the "car-haul" sector. According to Ragsdale, 27 of the employees came to the Debtors from some other industry. Others have skills and perform job duties that are not unique to the car-haul sector. For instance, employees who work in the finance, accounting, and payroll areas have easily transportable skills and could obtain new jobs in any industry. Additionally, Ragsdale pointed out that, even the employees who work in the maintenance department could transition to any company that maintains a fleet of vehicles.

For these same reasons, the Court is also persuaded that, contrary to the Teamsters Committee's view, the Debtors' Tier 1 employees would also have alternative job opportunities and would avail themselves of these opportunities without some form of KERP. The Teamsters Committee presented the testimony of Mr. Conyngham, which indicated that the Debtors' Tier 1 employees' compensation is already equivalent, if not higher than, the direct compensation paid to executives of similar-sized trucking companies. While this fact may be true, it does not convince the Court that the Debtors' Tier 1 employees would not leave the Debtors' employ to take a better job offer from a company in another industry. As the Debtors point out, other companies in other sectors can entice executives with stock options and other forms of deferred compensation that the Debtors cannot offer at this critical time.

■ Having considered all of the testimony presented, the Court concludes that the creation and approval of the KERP was a reasonable exercise of the Debtors' business judgment. Further, for many of these same reasons, the Court finds that, with certain exceptions, which will be outlined below, the KERP is fair and reasonable.

The Court's overall conclusion that the KERP is fair and reasonable is supported by the fact that the KERP is within the range of KERPs approved in other bankruptcy cases, that the KERP was designed with the assistance of an outside consulting firm with considerable experience designing incentive plans for financially distressed companies, and that the KERP provides benefits for a broad range of employees, rather than just the top level of executives. The Debtors' evidence established that the KERP, as originally proposed, represents only .5% of the Debtors' revenue and falls well within the range of KERPS approved in other bankruptcy cases, both as to the total cost and the

amount of the benefits offered.[7] Additionally, since Mr. Dempsey testified, the Debtors have proposed modifications to the KERP that will lower the total cost of the KERP by $111,000 and will reduce the percentage of the bonuses payable to the Tier 1 employees. As noted above, the Court must conclude that one aspect of the proposed severance payments is not reasonable. The severance provisions that contemplate payment of severance benefits in the event of a voluntary termination place too many restrictions on the Debtors' ability to utilize employees and may actually encourage an employee to resign in the event that the Debtors decide that an employee's job duties should be modified or that the employee should be relocated. The Court will approve the KERP if the Debtors agree to eliminate the following as triggers for severance benefits: 1) voluntary resignation because of a material diminishment in the scope of the employee's responsibilities and duties; 2) voluntary resignation because of the assignment of duties that are materially inconsistent with the employee's current position or current duties and responsibilities; and 3) voluntary resignation due to relocation of the employee by more than 50 miles without the employee's express written consent.

Second, the Court is persuaded by the evidence and arguments made by the Teamsters Committee that the amount of bonuses to be paid to the Tier 1 and 2 employees are not fair under the circumstances. The Debtors are seeking to pay bonuses equal to between 60% and 90% of annual salary to the Tier 1 and 2 employees. The Teamsters Committee presented evidence that the Debtors' Tier 1 employees' compensation is already equivalent, if not higher than, the direct compensation paid to executives of similar-sized trucking companies and that the Debtors' Tier 2 employees have received, on average, $40,000 more per year than their similarly situated counterparts.[8] The Debtors did not introduce any evidence to the contrary. While the Court agrees with the Debtors that the availability of higher compensation at other companies does create a risk that the Debtors' Tier 1 and 2 employees will be enticed to resign, this does not change the fact that the payment of such large bonuses on top of what appear to be market-level salaries, at this time would be unfair to the Debtors' unionized employees, considering the fact that the parties have indicated that the Debtors must seek further concessions from the unionized employees in order to make the reorganization a success.

The Court recognizes that the figures relied upon by Mr. Conyngham for the Tier 1 compensation comparison do not take into account the fact that top level executives at other companies have received stock options that have greatly increased the total compensation received. Although the Debtors' Tier 1 employees have received stock options over the past few years, this compensation has most likely been rendered valueless due to the decline of the Debtors' stock price. While it is true that the Debtors' executives could be enticed to leave the Debtors to join a company that can offer such benefits, the

---

7. The Teamsters Committee has taken issue with the choice of companies used in this comparison because these companies are larger and allegedly more complex than the Debtors. However, the comparison made by Mr. Dempsey does take into consideration the total number of employees, the percentage of employees designated as "key" employees, and the amount of revenue generated by the individual companies.

8. This testimony was based on Mr. Conyngham's experience, having reviewed the compensation paid to similar employees of 40 other companies within the trucking industry.

Court must agree with the Teamsters Committee that, at this time in the Debtors' reorganization, it is not reasonable to pay the Debtors' executives such large cash bonuses that are not directly tied to the Debtors' financial performance. As the Teamsters Committee points out, companies compensate management with stock options because the value of that compensation is dependent upon the success of the company and provides an incentive for the executives to achieve the best results possible. Although it may be necessary to match the alternative form of compensation available in the market in order to retain the Debtors' executives, it is not fair or reasonable to do so at this early time in the Debtors' bankruptcy case, especially in light of the fact that the Debtors have expressed an almost certain expectation that they will seek further concessions from the unionized employees.

That being said, the Court is also convinced that waiting to implement some form of KERP would be detrimental to the Debtors. Bankruptcy cases are often about compromising in order to ensure that all parties' interests are protected. To that end, the Court finds that the severance provisions and some form of retention bonus are necessary to retain the Debtors' Tier 1 and 2 employees. The retention bonuses, as modified by the Court, would be reasonable and fair under the circumstances. In approving a modified KERP, the Court finds substantial comfort in the fact that the Committee and the Debtors' post-petition lenders have supported the proposed KERP. For these reasons, the Court will approve the bonus provisions of the KERP with the following modifications.

First, as to Tiers 3 and 4, the Court finds that the payment of the first installment of the stay bonus to the Tier 3 and 4 employees on December 31, 2005, would be unreasonable, given the fact that the employees would earn and receive the bonus for staying with the Debtors for approximately two more weeks. The Court recognizes that it is not the fault of the employees that this matter was not resolved prior to this time and that the employees were undoubtedly hoping for payment of a bonus at the end of the year. However, the purpose of the KERP is not to reward employees, but to retain the employees. For this reason, the Court will approve the KERP if the Debtors agree to move the payment of the first installment of the bonus to February 28, 2006. The amendment should also provide that the second installment of bonus will be earned and payable if the employee remains employed by the Debtor on April 30, 2006, or the date upon which a plan is filed, whichever occurs earlier.

Second, for similar reasons, the Court concurs with the U.S. Trustee's position that the payment of a portion of the retention bonus to the Tier 1 and 2 employees upon the presentation of a business restructuring strategy would also be unreasonable under the circumstances. The Court will approve the KERP if the Debtors amend the KERP to provide that the stay/emergence bonus for the Tier 1 (excluding the President/CEO) and Tier 2 employees will be payable in three installments, the first payable upon the filing of a plan, the second payable upon confirmation of the plan, and the third payable 60 days after the effective date of the plan. The Debtors, the Committee, and the U.S. Trustee shall confer in good faith to determine the percentages of each payment and shall seek a ruling from the Court if they are unable to agree.

Third, the Court will approve the KERP provided the Debtors amend the KERP to lower the percentages of the bonuses as follows: Tier 1 employee bonuses should

not exceed 75% of annual salary, and Tier 2 employees bonuses should not exceed 70%.

## CONCLUSION

For the reasons stated above, if the Debtors amend the KERP consistent with the Court's conditions, the Court will enter an order granting the Debtors' Motion for Approval of a Key Employee Retention Program and will approve the KERP, as amended.

**IT IS SO ORDERED.**